## In re Twenty-Four Electric Utilities

[627 A.2d 355]

No. 92-325

Present: Allen, C.J., Gibson, Dooley and Morse, JJ., and Peck, J. (Ret.), Specially Assigned

Opinion Filed May 7, 1993

*John H. Marshall* and *Holly Ernst Groschner* of *Downs Rachlin & Martin*, St. Johnsbury, for Petitioners-Appellees.

*James A. Dumont* and *Bonnie Barnes* of *Sessions Keiner Dumont Barnes & Everitt, P.C.*, Middlebury, for Intervenors-Appellants.

*Christopher L. Dutton,* Burlington, for Appellee Green Mountain Power Corporation.

*Robert V. Simpson, Jr.,* Special Counsel, Montpelier, for Appellee Department of Public Service.

**Dooley, J.** This is the third appeal involving the contract to import electricity from Hydro-Quebec (HQ), a Canadian producer of electricity. In the first appeal, we affirmed the decision of the Vermont Public Service Board approving the contract with HQ. *In re Twenty-Four Vermont Utilities,* 159 Vt. 339, 363, 618 A.2d 1295, 1309 (1992) [*Hydro-Quebec I*]. In the second, we affirmed a Board decision approving a waiver and release that effectively extended the time for HQ to terminate the purchase requirement. *In re Twenty-Four Vermont Utilities,* 159 Vt. 363, 371, 618 A.2d 1309, 1314 (1992) [*Hydro-Quebec II*]. The present appeal concerns the Board's approval of the participation agreement that distributed the shares of the HQ purchase to the participating Vermont utilities. The Board's decision is challenged by the New England Coalition for Energy Efficiency and the Environment (NECEE). We affirm.

In the original proceeding, the Vermont utilities sought approval for both the purchase contract with HQ and for the participation agreement that determined how much electricity each utility would receive. The Board concluded that the requirements for approval specified in 30 V.S.A. § 248 were shown for the state as a whole. See *Hydro-Quebec I,* 159 Vt. at 358–59, 618 A.2d at 1307. It also concluded that the showings in support of each utility's share were inadequate, except as to Central Vermont Public Service and Burlington Electric Department. *Id.* It made the certificate of public good conditional on the approval of the individual allocations to each utility and required filings in support of the allocations within sixty days after its decision. The Board opened this docket,[1] specifying that each utility file a statement of position, including "prefiled testimony and exhibits demonstrating that the preferred allocations pro-

---

[1] It also opened a docket on proposals to resell part of the power and energy to HQ. In that docket, it has approved two proposals of CVPS and proposals of the Village of Morrisville Water and Light Department and Lyndonville Electric Department for resales.

mote the general good of Vermont in accordance with . . . section 248." It stated further that:

> In such proceedings, each participant (except Burlington Electric Department and Central Vermont Public Service Corporation) shall submit additional justification on how their respective allocations of Contract power under the Participation Agreement meet the present and future need for service that could not otherwise be met more cost-effectively through energy conservation, energy efficiency and load management measures. If the Board determines that any such Participant is entitled under the Participation Agreement to power that exceeds such demand for service such Participant shall offer to sell to Hydro-Quebec or other parties an amount of power (and associated energy) equal to such excess.

Pursuant to this order, each utility filed evidence supporting its allocation. The Department of Public Service analyzed this evidence, and in almost all cases supported the proposed allocations.

The Board held three days of evidentiary hearings and on February 12, 1992, approved the allocations for nineteen utilities.[2] The allocations for three utilities—Swanton Village, Inc. Electric Department; Village of Jacksonville Electric Company; Town of Readsboro Electric Light Department—were not approved.[3] Post-judgment motions of NECEE were denied on May 21, 1992, and this appeal followed.

In the original appeal, NECEE first attacked the Board's decision to bifurcate the proceedings, characterizing it as unlawfully segmenting the § 248 approval process and thereby avoiding a utility-by-utility analysis under each of the factors bearing on the public good. That position was largely addressed

---

[2] The allocation for Franklin Electric Light Company was approved only in part. Franklin was required to make a further filing in support of its full allocation.

[3] The voters in these communities did not approve the purchase contract. Accordingly, the allocations would not be purchased even if need had been shown. The same situation occurred with respect to Burlington Electric Department, although the Board already had approved this allocation. Pursuant to the HQ contract, the overall amount purchased was reduced to reflect these disapprovals.

in *Hydro-Quebec I*, 159 Vt. at 359, 618 A.2d at 1307. There, we approved the certificate of public good, subject to later approval of the allocations, reasoning that:

> The Board determined that the energy supplied in the HQ contract was needed in the state; the only open question was the allocation among the participating utilities. There was no reason to delay the contract with HQ while the allocation was being determined. The Board's power to order reallocation or resale meant that there could be no prejudice to any ratepayer or to the intervenors.

*Id.* We also noted that the alternative of twenty-four separate proceedings "would be oppressive and could lead to inconsistent results," and the Board had the power to make the proceedings "manageable while protecting fully the rights of the parties." *Id.*

In its reply brief, NECEE acknowledges that *Hydro-Quebec I* answered many of the issues raised in this appeal. Certain of its remaining contentions are also foreclosed by *Hydro-Quebec I*. Specifically, NECEE argues that the Board erred in failing to consider the economic benefits in increased jobs and tax revenues from demand-side management (DSM) investments, as well as the conflict between the HQ purchase and in-state generation sources. These arguments were made in *Hydro-Quebec I* and rejected. *Id.* at 359–60, 618 A.2d at 1307. We found no error in the failure to consider the job creation and tax revenue consequences of DSM because there was no conflict between intensified demand-side management (IDSM) and the HQ purchase. *Id.* at 360, 618 A.2d at 1307. We refused to consider conflicts between in-state generation sources and the HQ purchase because NECEE failed to raise the issue before the Board. *Id.* NECEE cannot raise these issues anew in this follow-up proceeding.[4] See *In re Vermont Power Exch.*, 159 Vt. 168, 180–81, 617 A.2d 418, 425 (1992).

---

[4] For this reason, we also refuse to consider either NECEE's new argument that 1981, No. 236 (Adj. Sess.), § 2(2), establishing a state energy policy, requires reliance on in-state generation to the greatest extent practicable; or its argument that 30 V.S.A. § 248(b)(4), as added by 1987, No. 65, § 1, requires consideration of the economic benefit to in-state generation from DSM.

■ We also believe that the resolution of *Hydro-Quebec I* precludes revisiting the Board's treatment of DSM. In this case, NECEE argues that the extent to which DSM will reduce the need for other sources of electricity varies from utility to utility, depending in part on the extent to which the utility has already implemented DSM. It claims that the Board was required to determine the DSM potential of each utility as part of its consideration of the proposed allocation. Instead, based on expert testimony, the Board assumed the average DSM effect. See *Hydro-Quebec I*, 159 Vt. at 345, 618 A.2d at 1299 (IDSM will reduce peak load by 27% and energy demand by 20% in the year 2000).[5] Because the overall purchase decision was based on IDSM, it was reasonable to base the allocation on the same demand-reduction assumptions. Without applying similar methodology, it is likely that the allocation decision would be inconsistent with the purchase decision.

A part of NECEE's appeal challenges the manner in which the Board conducted the follow-up proceeding, and we agree that this issue is not foreclosed by *Hydro-Quebec I*. Specifically, NECEE argues that the Board restricted the proceeding to an analysis of utility-by-utility need, and then improperly relied upon nonneed factors when it discovered that some utilities did not need all the electricity allocated to them. NECEE bases this argument on showings by Green Mountain Power Corporation (GMP) and Citizens Utilities Company (Citizens) as to the optimum electricity purchase from HQ.

Most of the utilities showed that their HQ allocations would reduce supply costs in the future and not interfere with the need to pursue IDSM. Most of them did not show, however, whether their allocations were optimum, in the sense that the allocations maximized the cost savings over other available sources of supply. The evidence provided by GMP and Citizens showed that savings for these utilities would be maximized by a smaller allocation than that provided in the participation agreement. For GMP, the Board found that a five megawatt reduction

---

[5] The levels of demand reduction determined in *Hydro-Quebec I* were based on New England load shapes. When IDSM was applied to Vermont-specific load shapes, the reductions were modified to 20% of total participant energy demand and 21% of peak demand in the year 2000.

under one of the purchase schedules would optimize savings, but the savings did not "differ significantly" between the allocated amount and the optimum amount. For Citizens, the Board found that a 10% decrease in its allocation would increase savings by 7%. In both cases, the Board approved the allocation in the participation agreement because of uncertainty associated with other sources of supply. For example, the main alternative for GMP, a cogeneration plant, was not permitted at the time of the analysis. NECEE characterizes the consideration of risk as a "non-need" factor, and argues that it was improper for the Board to rely on such factors.

■ We emphasize that "[i]n a § 248 proceeding, the Board 'is engaged in a legislative, policy-making process.'" *Hydro-Quebec I*, 159 Vt. at 357, 618 A.2d at 1306 (quoting *Auclair v. Vermont Elec. Power Co.*, 133 Vt. 22, 26, 329 A.2d 641, 644 (1974)). It must use its "particular expertise and informed judgment" to weigh the alternatives presented to it. *Id.* We give deference to this expertise and informed judgment, and accord a strong presumption of validity to orders of the Board. *In re East Georgia Cogeneration Ltd. Partnership*, 158 Vt. 525, 531, 614 A.2d 799, 803 (1992).

■ The essence of the Board's view is contained in its conclusion that "'optimization' must both be dynamic over time and must recognize that the goal is a 'best fit' rather than unattainably absolute perfection." In view of the broad § 248 criteria involved, see 30 V.S.A. §§ 248(a) (purchase must "promote the general good of the state"), 248(b)(4) (purchase must provide an "economic benefit" to the state and its residents), allowing an allocation above the optimum was within the Board's discretion.[6] The amounts involved here are relatively small, and the Board could rely on the resale requirement in its initial order. We note that DSM is not involved directly in this issue because there is no conflict between IDSM and the allocated purchase amounts. Thus, however we decide this issue, GMP and Citizens must pursue and obtain all of the DSM savings the Board found feasible.

---

[6] We also find within the Board's discretion its decision to leave specific reallocation or resale orders to the future.

Nor do we find error in the consideration of "non-need" factors. Despite NECEE's assertion to the contrary, the contested factors actually go to need because they involve the availability and magnitude of alternative sources of supply. The Board felt that "unexpected outages of existing and planned supply resources" and uncertainties in the "magnitude and availability of non-utility generation," as well as risks in the economy, warrant allowance of an HQ purchase slightly above the optimum level. Moreover, *Hydro-Quebec I* resolved whether there would be a HQ purchase and the amount of that purchase. This follow-up proceeding determined the proper allocation of the purchase. Nothing bearing on the allocation was foreclosed from consideration, except to the extent that one of the § 248(b) factors had been determined in the analysis of the overall purchase. Thus, we see no error in examining the reliability of an alternative source of supply available to a particular utility in determining whether the HQ purchase should supplant that source of supply. The overall determination of need in *Hydro-Quebec I* did not foreclose this inquiry.

 NECEE also raises a procedural objection to the consideration of "non-need" factors, arguing that it was denied notice of the scope of the proceeding and an opportunity to "present evidence and argument on all issues involved," as required by the Administrative Procedure Act (APA), 3 V.S.A. § 809(a), (b), (c). The standard of review for such claims is set forth in *In re Green Mountain Power Corp.*, 131 Vt. 284, 293, 305 A.2d 571, 577 (1973):

> The question on review is not the adequacy of the original notice or pleading but is the fairness of the whole procedure. Critical to a determination of whether the procedure was fair is whether or not the parties were given an adequate opportunity to prepare and respond to the issues raised in the proceeding.

See also *In re Hot Spot, Inc.*, 149 Vt. 538, 540, 546 A.2d 799, 801 (1988) (notice in administrative proceeding "need only be reasonable"). As NECEE emphasizes, the Board limited the scope of the proceeding to determining whether the allocations "meet the present and future need for service that could not otherwise be met . . . through energy conservation, energy efficiency and load management measures."

The "non-need" factors to which NECEE objects relate primarily to alternative sources of supply. These considerations fairly go to the need for service and thus were within the scope of the proceeding as originally defined. Moreover, they were raised in the prefiled testimony of the utilities, giving NECEE notice that they were before the Board. NECEE had an adequate opportunity to prepare and respond to these issues. See *Hydro-Quebec II*, 159 Vt. at 369, 618 A.2d at 1313. We see no violation of the APA.

NECEE's third claim is that the Board erred in admitting and relying on expert testimony from two employees of the Public Service Department, the Director of Regulated Utility Planning and a power cost analyst. The Department witnesses analyzed the information filed by each utility to determine whether it was credible and whether it showed net savings resulting from the HQ allocation. The witnesses did not determine whether the allocations were optimum or whether a smaller purchase would alter the savings, except in the limited cases, discussed above, where the utilities did such analysis. Nor did the witnesses memorialize their analysis in writing. They testified to their conclusions and their general methodology in reaching them.

NECEE's objections to the expert witnesses' testimony surfaced in cross-examination about their opinions of the utilities' ability to sell excess electricity. The filings for a number of utilities indicated that they expected to resell some baseload power or surplus energy or both. Because the utilities often did not provide information about the terms and conditions of the sales, the Department witnesses made certain assumptions about these terms and conditions based on historic sales of other electricity. In some cases, they concluded that the terms of resale did not matter because there would be net savings from the HQ allocation under any assumption. When the witnesses indicated that they had not memorialized their assumptions or analysis on this issue, NECEE moved to strike all their testimony as without "evidentiary foundation." On appeal, NECEE contests both the admission of the testimony and the Board's reliance upon it.

NECEE does not contest that this is a proper subject for expert testimony. See 3 V.S.A. § 810(1) (rules of evidence apply

to administrative proceeding except when necessary to ascertain facts "not reasonably susceptible of proof under those rules"); V.R.E. 702 (expert witness may give opinion where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"). Nor does it contest that the witnesses could base their opinion on the utility filings, as well as other facts or data known to them. See V.R.E. 703. Its objection comes from V.R.E. 705:

> The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

This rule provides for disclosure of the basis for an expert opinion, and is grounded on the principle that the court may not admit an opinion with an inadequate basis. See Reporter's Notes to V.R.E. 705 ("[i]f the cross-examination discloses that the facts or data are insufficient to support the opinion, the court may strike the testimony"). The principle is rarely invoked, however, because an inadequate basis means the evidence has little weight. See 2 J. Wigmore, Evidence § 659(c), at 898 (Chadbourn rev. 1979).

■■ NECEE has failed to show that the bases for the witnesses' opinions were inadequate. Its real objection is that the witnesses failed to write down their analysis. Most of the utility data and calculations relied on by the Department witnesses had been admitted in evidence. NECEE could have insisted that the witnesses produce the rest. Using that data, NECEE could have taken the Department witnesses through their analysis requiring them to show exactly how they reached their conclusions. While this process may have been tedious, it was not unfair. As the Advisory Committee's Note to the identical Federal Rule of Evidence discusses, the rule assumes that the cross-examiner engaged in sufficient discovery to acquire the advance knowledge necessary to bring out the facts or data "unfavorable to the opinion." Fed. R. Evid. 705, Advisory Committee's Note. An opinion does not become inadmissible because the opponent, as a result of its failure to engage in

discovery, is forced to use cross-examination to discover the foundation of the opinion.

Moreover, NECEE accomplished much of its purpose through cross-examination. For example, it showed reasons to question the assumptions about the effect of power resales, and the lack of a written analysis undermined the force of the witnesses' opinions. As the rule contemplates, the cross-examination went to the weight, not the admissibility, of the expert opinions. See *United States v. Kail*, 804 F.2d 441, 448 (8th Cir. 1986).

NECEE attacks the findings that were based on the testimony of the Department witnesses because they are "recitations of testimony," in violation of the holding in *Krupp v. Krupp*, 126 Vt. 511, 514, 236 A.2d 653, 656 (1967). By recitations of testimony, we mean that the fact-finder has stated only what the evidence was and not the facts that were found from the evidence. See *Harrington v. Department of Employment Sec.*, 142 Vt. 340, 346, 455 A.2d 333, 337 (1982) (use of terms such as "alleges" or "testifies" in a finding is improper, citing *Krupp*). In this case, the Board made findings, not recitations of testimony. The fact that the findings completely accept the evidence of the Department's witnesses does not make them ineffective. We find no error in the admission of the testimony of the Department's expert witnesses or in the Board's findings based on that testimony.

*Affirmed.*