1 A.3d 1007 (2010)
2010 VT 50
In re E.C.
No. 09-040.
Supreme Court of Vermont.
June 2, 2010.
*1008 Present: DOOLEY, JOHNSON, SKOGLUND, BURGESS, JJ., and REIBER, C.J.

ENTRY ORDER
¶ 1. Appellant Department of Disabilities, Aging and Independent Living appeals a decision by the Human Services Board reversing the Department's substantiation of abuse by petitioner E.C. The Department contends that the Board misapplied 33 V.S.A. § 6902(1)(E) in its determination that petitioner's conduct did not meet the definition of abuse and that the Board did not set forth sufficient findings to form the basis for a decision. We affirm.
¶ 2. Petitioner worked as an individual assistant for special-needs students, providing one-on-one services to severely disabled students for approximately seventeen years. For four years, petitioner worked with A.M., a nineteen-year-old who has difficulty ambulating, impaired vision, a seizure disorder, and significant developmental delays and learning needs. A.M. uses a walker and has limited ability to walk and stand in a swimming pool, but *1009 has good upper body strength. He has the cognitive abilities of a child between the ages of two and four years old.
¶ 3. On February 21, 2008, petitioner and A.M. attended a physical therapy program for special-needs students in the swimming pool of a local fitness center. A.M.'s program included a series of abdominal crunches, which required petitioner to stand with her back against the wall of the pool and to support A.M. from behind. Petitioner would typically hold A.M. under his arms and around his chest while A.M. would lift his knees up toward his chest. On this particular day, however, A.M. did not want to do the exercises. He was noncompliant, splashing and vocalizing, rather than following petitioner's instructions. Petitioner asked A.M. to do the crunches, and he refused. When he said "no," petitioner, without warning, put her hands on A.M.'s shoulders and dunked him underwater three times. After the third time, A.M. refocused and continued his program. The entire incident lasted for approximately twenty-five seconds.
¶ 4. The incident was promptly reported to the Department. Under Vermont law, upon receiving a report of abuse, the Department must investigate the report to determine if it can be substantiated. 33 V.S.A. § 6906. A person whose abuse has been substantiated has his or her name added to a registry of persons found to have committed abuse that is maintained by the Department. Id. § 6911(b). The registry is used by, among others, state agencies and prospective employers. See id. § 6911(c). Once listed, a person may seek to have his or her name expunged from the registry. Id. § 6911(f).
¶ 5. On September 9, 2008, the Department informed petitioner of its decision to substantiate the report of her abuse of a vulnerable adult, concluding that she had violated §§ 6902(1)(B) and 6902(1)(E), which define two types of abuse.[1] Petitioner appealed the Department's substantiation to the Human Services Board, see § 6906(d), which held a fair hearing on November 17, 2008. See 3 V.S.A. § 3091. Both parties stipulated prior to the hearing that A.M. was a "vulnerable adult" within the meaning of the statute. See 33 V.S.A. § 6902(14). Therefore, the only issue before the Board was whether petitioner's conduct constituted abuse. On January 12, 2009, the Board reversed the Department's decision to substantiate the report of abuse. The Board concluded that petitioner's actions, although "troubling" and "unprofessional," did not fall within any of the statutory definitions of abuse set forth in § 6902(1). The Department timely appealed the Board's decision to this Court.
¶ 6. We generally give deference to the Board's decisions, In re P.J., 2009 VT 5, ¶ 7, 185 Vt. 606, 969 A.2d 133 (mem.), and will not set aside the Board's findings unless they are clearly erroneous. Zingher v. Dep't of Aging & Disabilities, 163 Vt. 566, 572, 664 A.2d 256, 259 (1995). Our review is thus limited to determining whether the Board applied the proper legal standard, whether the evidence before the Board reasonably supports its findings, and whether the Board's findings reasonably support its conclusions. In re Tinker, 165 Vt. 621, 622, 686 A.2d 946, 948 (1996) (mem.); Harrington v. Dep't of Employ. Sec., 142 Vt. 340, 344, 455 A.2d 333, 336 (1982); cf. In re Entergy Nuclear Vt. Yankee *1010 Discharge Permit, 2009 VT 124, ¶ 36, ___ Vt. ___, 989 A.2d 563 ("[W]here the trial court has applied the proper legal standard, we will uphold its conclusions of law if reasonably supported by its findings." (quotation omitted)). In reviewing the sufficiency of the Board's findings, "we will construe the record in a manner most favorable to the Board's conclusions." Harrington, 142 Vt. at 344, 455 A.2d at 336.
¶ 7. The Department's first contention on appeal is that the Board applied the incorrect legal standard when it determined that petitioner did not abuse A.M. This contention is limited to the Board's conclusion that petitioner did not violate § 6902(1)(E).[2] That section defines abuse to mean "[i]ntentionally subjecting a vulnerable adult to behavior which should reasonably be expected to result in intimidation, fear, humiliation, degradation, agitation, disorientation, or other forms of serious emotional distress." The Department argues that this definition embodies an objective standard; that is, that the Board should have determined whether petitioner's conduct, from a reasonable person's perspective, "should reasonably be expected" to result in the enumerated types of emotional distress. The Department adds that the Board instead focused on whether A.M. actually suffered emotional distress, noting the Board's reliance on the fact that "A.M. was agitated prior to and during the dunking but not afterwards" and on A.M.'s "ability to get back on track." Furthermore, the Department contends if the correct standard had been applied, that the Board would have had no choice but to substantiate the abuse as a matter of law. Although we agree that the legal standard at issue is an objective standard, we do not agree that the facts demonstrate abuse as a matter of law. We conclude that the Board's decision was consistent with an objective standard and that the Board acted within its discretion.
¶ 8. Our first recourse when interpreting a statute is to look to the plain language of the enactment. Chayer v. Ethan Allen, Inc., 2008 VT 45, ¶ 10, 183 Vt. 439, 954 A.2d 783. The plain meaning of the statute indicates that it has both subjective and objective elements. The mental element of the statute is subjectivethe individual in question must have acted intentionally. The result of the individual's behavior is measured by an objective standardwhether it is reasonably to be expected that the individual's behavior will result in serious emotional distress in the vulnerable adult. Although we can reach this construction relying on the plain meaning of the language, our conclusion is also supported by the underlying purpose of the statute. See Devers-Scott v. Office of Prof'l Regulation, 2007 VT 4, ¶ 34, 181 Vt. 248, 918 A.2d 230 (noting that when plain meaning is not clear, underlying purpose of statute should guide analysis). Section 6901 indicates that the underlying purpose of the abuse-of-vulnerable-adults provisions is to "protect vulnerable adults whose health and welfare may be adversely affected through abuse." An objective standard of behavior best furthers this purpose.
¶ 9. The Minnesota Court of Appeals recently addressed the same issue when construing a similar statute and arrived at the same conclusion. In re Kleven, 736 *1011 N.W.2d 707 (Minn.Ct.App.2007). The Minnesota statute at issue defined abuse as "[c]onduct which is not an accident or therapeutic conduct... which produces or could reasonably be expected to produce physical pain or injury or emotional distress." Minn.Stat. § 626.5572, subd. 2(b) (2004) (emphasis added). The court, in interpreting the statute, was required to choose between applying a subjective standard or an objective standard. The court concluded that the subjective standard was "an affront to the purpose of the act and [would lead] to absurd results," for application of that standard "would mean that the more vulnerable the adult, the worse his caretaker could permissibly treat him." Kleven, 736 N.W.2d at 711. Therefore, the court interpreted the statute to set an objective standard. Id.; see also Williams v. Watkins, 379 S.C. 530, 665 S.E.2d 243, 246 (App.2008) (citing Kleven favorably). We agree with the Kleven decision.
¶ 10. We cannot conclude, however, that under the objective standard the facts show that petitioner committed abuse as a matter of law. The Department relies upon the dictionary definitions of "intimidation," "agitation," and "disorientation" to show that the terms have relatively low thresholds that must have been met here. Rather than relying on abstract definitions, we must evaluate the meaning of these terms in the context of the statute. The canon of construction, "noscitur a sociis," which more or less means, "it is known by its associates," MacDonough-Webster Lodge No. 26 v. Wells, 2003 VT 70, ¶ 11 n. 2, 175 Vt. 382, 834 A.2d 25, requires us to "seek the meaning from the context, and by the light of what precedes or follows." Park's Adm'r v. Am. Home Missionary Soc'y, 62 Vt. 19, 25, 20 A. 107, 108 (1890). The statute contains the terms "intimidation," "agitation," and "disorientation," among others, and importantly concludes with the phrase, "or other forms of serious emotional distress." 33 V.S.A. § 6902(1)(E) (emphasis added). This catchall indicates that the Legislature intended that the results in the statutory list apply only if they rise to the level of "serious emotional distress." See id. The Department impliedly acknowledges that there is a severity element embodied in the statute in its distinction between playful, pre-warned dunking and that which occurred here. Both the good and bad dunking can cause some degree of disorientation and agitation. We do not believe that we can draw the line so easily between one kind of dunking and another.
¶ 11. Assuming that the facts do not show abuse as a matter of law, the Department next argues that the Board construed the statute as containing a subjective standard because it focused on the effect of the dunking on A.M. The Board never expressly stated whether it adopted an objective standard or a subjective standard when applying § 6902(1)(E), which is not surprising because neither party raised this point in the initial presentations. Nevertheless, the Board described the issue as whether the dunking "should be reasonably expected to result in agitation or disorientation," the expression of a purely objective standard. It also noted that petitioner's conduct could cause disorientation or agitation, again an objective standard.
¶ 12. In arguing that the Board did not actually use the objective standard the Department points to the Board's reliance in part on A.M.'s reaction to the dunking incident. We agree that it would have been improper for the Board to have found A.M.'s reaction alone to be determinative.[3] However, it is not improper for *1012 the Board to do what it did hereto consider A.M.'s actual reaction as an important factor in reaching the decision not to substantiate the report of abuse. Cf. Murphy v. City of Aventura, 616 F.Supp.2d 1267, 1274-75 (S.D.Fla.2009) (including extent to which employer's conduct adversely affects employee's job performance among objective factors to be considered in determining whether hostile work environment exists); Almond v. Tarver, 468 F.Supp.2d 886, 899 (E.D.Tex.2006) (listing "the extent of the injury suffered" among the objective factors to be considered in evaluating excessive force claim); Fluor Alaska, Inc. v. Mendoza, 616 P.2d 25, 27 (Alaska 1980) (concluding that Workers' Compensation Board acted properly in relying in part on patient's actual fears in determining whether patient's refusal to undergo surgery was objectively reasonable). The application of an objective reasonableness test does not preclude the Board from considering the actual consequences of petitioner's conduct to assist it in determining how a reasonable person would view such conduct. Cf. Murphy, 616 F.Supp.2d at 1275; Almond, 468 F.Supp.2d at 899. Indeed, the Department asks us to look at just this kind of evidencethe reaction of observers of the incidentin evaluation of whether the standard was met.
¶ 13. In viewing the Board's decision in its entirety, we conclude that the Board applied the proper standard and acted within its discretion. Not only did the Board note that the incident did not appear to cause the adverse results to A.M. enumerated in the statute, it also relied upon the fact that the incident was of brief duration and involved only three dunkings. The Board acted within its discretion in concluding that petitioner's behavior could not reasonably be expected to cause the disorientation or agitation contemplated in the statute.
¶ 14. The Department last argues that this Court should remand the Board's decision for further proceedings due to inadequate findings of fact. In Krupp v. Krupp, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967), this Court held that a mere recitation of testimony is not the equivalent of a finding of the facts contained in that testimony. Thus, "Krupp findings" cannot form the basis for a decision. See id. The Department contends that the Board's findings consist largely of recitations of the testimony provided by petitioner and six witnesses who were at the pool on the day of the incident, and thus that the Board "stated only what the evidence was and not the facts that were found from the evidence." In re Twenty-Four Elec. Utils., 160 Vt. 227, 237, 627 A.2d 355, 361 (1993). We disagree.
¶ 15. The Board makes sufficient findings of fact to support its reversal of the Department's substantiation. Although many of these findings are located in the "Reasons" section of the Board's decision, rather than in the "Findings of Fact" section, this is not a fatal defect. See Harrington, 142 Vt. at 346, 455 A.2d at 337; LaFountain v. Employ. Sec. Bd., 133 Vt. 42, 45, 330 A.2d 468, 470 (1974). The Board found that: petitioner dunked A.M. three times; the incident lasted less than twenty-five seconds; A.M. was agitated prior to and during the dunking; A.M. was not agitated after the dunking; and after the incident, A.M. started his crunches and completed the remainder of his physical therapy program. These findings are sufficient to support the Board's determination that petitioner did not abuse A.M. We therefore affirm the Board's decision.
Affirmed.
*1013 REIBER, C.J., dissenting.
¶ 16. The majority's decision today affirms a holding that depriving a vulnerable adult of oxygen by dunking him multiple times, without warning and against his will, should not "reasonably be expected to result in intimidation [or] fear." 33 V.S.A. § 6902(1)(E).[4] I cannot agree with such a conclusion, and I therefore dissent.
¶ 17. The majority's decision adopts an objective standard but then resolves the case on subjective factors. I agree with the majority's conclusion that the standard must be objective, not subjective. I disagree with the majority's application of that standard and with the notion that an objective standard can ever consider, let alone view "as an important factor," ante, ¶ 12, the subjective reaction of a vulnerable adult. Because the Human Services Board applied an incorrect legal standard, and because an application of the proper legal standard reveals that, from an objective standpoint, petitioner's conduct was abuse under § 6902(1)(E), I would reverse the Board and uphold the substantiation of abuse found by the Department of Disabilities, Aging and Independent Living.
¶ 18. As an initial matter, I cannot agree with the majority's conclusion that we should apply a deferential standard of review in this case when it is clear that the Board applied an incorrect legal standard. As the United States Supreme Court has recognized, it is "necessarily [an] abuse [of] discretion if [a trial court] based its ruling on an erroneous view of the law." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). Here, despite the majority's attempt to reconcile the Board's decision with the objective analysis that is legally required, the Board's decision in fact rests entirely on a subjective analysis. The Board therefore applied an incorrect legal standard and should be reversed.
¶ 19. That the Board's decision rested entirely on a subjective analysis is evident from the majority's summary of the five findings that led the Board to conclude that there was no abuse:
The Board found that: [1] petitioner dunked A.M. three times; [2] the incident lasted less than twenty-five seconds; [3] A.M. was agitated prior to and during the dunking; [4] A.M. was not agitated after the dunking; and [5] after the incident, A.M. started his crunches and completed the remainder of his physical therapy program.
Ante, ¶ 15. The majority concludes that these five findings were "sufficient to support the Board's determination that petitioner did not abuse A.M." Id. I disagree. Of the five findings, the first twothe fact that "petitioner dunked A.M. three times" and the fact that "the incident lasted less than twentyfive seconds"are simply stated as bare facts, and the Board does not state in its decision that these facts support its conclusion that there was no abuse. Nor could the Board make such an statement here, since the repetition of the dunking and the fact that it occurred over a significant time period could only be used to support the conclusion that petitioner's actions were abuse.[5] As for the *1014 remaining three findings, all of which deal with A.M.'s subjective reaction, again the Board simply stated these as facts and did not provide any explanation as to why they supported the conclusion that there was no abuse: the Board did not make a single finding regarding the significance of A.M.'s subjective reaction. Perhaps the Board thought it was obvious that A.M.'s subjective reaction supported there being no abuse. But A.M.'s reaction is completely consistent with a finding of abusethe fact that he calmed down and began obeying petitioner's orders could easily be seen as an indication that he was intimidated by and fearful of petitioner. At the very least, the Board needed to make a finding on this issue.
¶ 20. More important, even if the Board had made findings regarding the significance of A.M.'s subjective reaction, those findings would be irrelevant here because the statute calls for a purely objective analysis. It is the act, not its consequences or lack thereof, that defines abuse under § 6902(1)(E). The majority correctly notes that the standard must be an objective one because a standard that relies on the subjective reaction of a vulnerable adult "would mean that the more vulnerable the adult, the worse his caretaker could permissibly treat him." In re Kleven, 736 N.W.2d 707, 711 (Minn.Ct.App. 2007). As the Department argued below, a subjective standard would mean that "there would be no protections for those, for instance, who are unable to express themselves or even, because of their impairments, to feel pain." Although the majority purports to "agree with the Kleven decision," ante, ¶ 9, the choice to give any weight whatsoever to A.M.'s subjective reaction is directly contrary to the Kleven decision. In Kleven, the person accused of committing abuse argued that the court should take into account the fact that vulnerable adults often react more mildly than ordinary adultsor are not affected at allwhen subjected to abusive behavior. The Kleven court rejected this argument. The court did not want to adopt any sort of "no harm no foul" rule for abusing vulnerable adults, and it refused to interpret a vulnerable-adult statute in a way that "results in decreasing protection for increasingly vulnerable adults." 736 N.W.2d at 711. Yet that is exactly what the Board did here, where their decision provided A.M. with less protection from abuse based solely on his failure to react in the precise manner that the Board expected that people would react when abused.[6]
*1015 ¶ 21. In short, the whole point of an objective standard is to ensure that everyone is treated the same, regardless of what type of reaction they happen to have to a situation. See, e.g., Salmon v. Dep't of Pub. Health & Addiction Servs., 259 Conn. 288, 788 A.2d 1199, 1208 (2002) ("[A]n objective standard must be used in determining whether a resident has suffered any harm or adverse impact as a result of alleged abuse. If a subjective standard were to be employed, those residents who are impaired or incapable of perceiving or articulating their individual experiences would be excluded from the protection otherwise afforded by the statute; abuse, as a matter of law, could never be established in such cases."); cf., e.g., Nat'l Labor Relations Bd. v. Deauville Hotel, 751 F.2d 1562, 1569 (11th Cir.1985) ("An objective test... permit[s] fair treatment of everyone involved."); DeBusk v. Johns Hopkins Hosp., 342 Md. 432, 677 A.2d 73, 76 (1996) ("Objective standards ... are the very keys to predictability, in the sense that everyone is treated in the same manner...."). I therefore disagree with the majority's conclusion that an objective analysis can "consider A.M.'s actual reaction as an important factor." Ante, ¶ 12.[7] In my view, A.M.'s subjective reaction to the situation is irrelevant to our objective analysis.
¶ 22. In this case, petitioner appears to be a genuinely caring individual with a long history of exemplary behavior, but someone who in this instance made a serious mistake. Thus, although I do not doubt that petitioner regrets her actions *1016 and is unlikely to repeat them, that should not affect our analysis of what in this instance is a very straightforward case. The question before this Court is whether, from an objective standpoint, unwarned dunkings of a vulnerable adult "should reasonably be expected to result in intimidation [or] fear." 33 V.S.A. § 6902(1)(E). The Board noted that A.M. has only a "limited ability to walk and stand in a swimming pool." As a result, when he enters the swimming pool, he is likely dependent on his caregiver to keep his head above water. It was abuse when petitioner did the opposite and dunked him without warning. As the Department argued below, the "fear of asphyxiation is real and terrifying." I agree. In my view, regardless of A.M.'s actual subjective reaction, the unwarned dunkings that occurred here "should reasonably be expected to result in intimidation [or] fear." 33 V.S.A. § 6902(1)(E). I therefore dissent.
NOTES
[1] The Deputy Commissioner also substantiated abuse under § 6902(1)(A) (treatment that places life, health or welfare in jeopardy or which is likely to result in impairment of health), but the Department did not defend the substantiation on that basis before the Human Services Board, and it is therefore no longer an issue in the case.
[2] The dissent relies upon the Board's analysis of § 6902(1)(B) to demonstrate that it relied upon a subjective, not objective, standard. See post, ¶ 19. The Department's argument that the Board used the wrong standard did not include the Board's analysis of whether petitioner violated § 6902(1)(B). Under these circumstances, its analysis of § 6902(1)(B) is irrelevant to our decision.
[3] We would also agree with the dissent that a "no harm no foul" rule would have been inconsistent with the statute. The Board did not adopt such a rule.
[4] Section 6902(1)(E) defines as abuse any intentional action that "should reasonably be expected to result in intimidation, fear, humiliation, degradation, agitation, disorientation, or other forms of serious emotional distress." Although petitioner's actions arguably trigger a number of these forms of abuse, including agitation and disorientation, I limit my discussion here to the most obvious point that her actions should be expected to cause intimidation and fear.
[5] Surely neither the majority nor the Board is seriously suggesting that petitioner's actions are excusable because A.M. was dunked only three times and the incident lasted only twenty-five seconds. When it comes to abuse, we do not recognize a three-strikes rule or any other defense that would excuse a solitary or brief act of abuse. Punching, kicking, or cutting off the oxygen supply of a vulnerable adult once or even twice, let alone three times, is abuse.
[6] Again, we have no idea what type of reaction would have convinced the Board that abuse occurred here, since the Board made no findings on the significance of A.M.'s reaction. The majority fails to address the fact that, in reaching the conclusion that no abuse occurred, the only findings supporting the Board are findings relating to the fact that A.M. was not harmed. As explained above, this is apparent from the Board's analysis of § 6902(1)(E), where the Board listed five factual findings, two of which support a conclusion of abuse, and the remaining three of which state nothing more than the fact that A.M. was not harmed. The Board's erroneous focus on whether A.M. was harmed is even more transparent in its analysis of § 6902(1)(B), which prohibits "conduct committed with an intent or reckless disregard that such conduct is likely to cause unnecessary harm, unnecessary pain or unnecessary suffering to a vulnerable adult." On this point, the Board made the following five findings:

First, despite petitioner's experience at deescalating her students' problem behaviors, she did not apply her experience when A.M. acted up in the pool....
Second, petitioner's explanation that she thought A.M. would associate the dunking with fun and then settle down is not credible....
Third, petitioner's co-workers ... [with one exception] were surprised and bothered by what they witnessed....
Fourth, petitioner was upset by her actions....
Fifth, A.M. was not harmed.
Of these five findings, the first four support a finding of abuse under § 6902(1)(B). The only finding that potentially supports the Board's conclusion that there was no abuse is the fifth onethat "A.M. was not harmed"a conclusion that speaks only to A.M.'s subjective reaction to the situation and that therefore should not be considered. Although the majority agrees with me that the statute does not allow the adoption of a "no harm no foul" rule, the majority claims that "the Board did not adopt such a rule." Ante, ¶ 12 n. 3. But the Board's analysis of § 6902(1)(B) makes it clear that the Board adopted precisely that type of rule when it found no abuse on the sole basis of the fact that "A.M. was not harmed," even though every one of the remaining four factual findings pointed toward a conclusion that there was abuse. The Board adopted this same type of improper analysis in addressing whether respondent violated § 6902(1)(E). Thus, in my view, not only did the Board adopt a "no harm no foul" rule, but that rule formed the sole basis for the Board's decision regarding §§ 6902(1)(B) and 6902(1)(E).
[7] Several of the cases that the majority cites for this proposition are inapposite because they deal with legal standards that incorporate some requirement beyond a pure objective standard. For instance, the majority cites Almond v. Tarver, 468 F.Supp.2d 886, 899 (E.D.Tex.2006), because it lists "the extent of the injury suffered" among the objective factors to be considered in evaluating an excessive force claim. But the Almond court stated that excessive force claims require that the actual "injury must be more than de minimis." Id. at 900. Thus, it is not surprising that the Almond court would look to the severity of the actual injury in evaluating those claims. Here, on the other hand, it is inappropriate to bring a subjective element into the evaluation of whether a vulnerable adult has been abusedan evaluation that does not depend at all on whether an actual injury occurred. I also disagree with the majority's claim that Murphy v. City of Aventura, 616 F.Supp.2d 1267 (S.D.Fla.2009), supports folding a subjective element into an objective analysis. Murphy involved a special test under Title VII that "includes a subjective and objective component." Id. at 1274. Here, on the other hand, the test for abuse of a vulnerable adult is purely objective.