2010 VT 101

## In re M.G. and K.G.

[13 A.3d 1084]

No. 09-381

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 5, 2010

*Wayne R. Young,* Norwich, for Petitioners-Appellees.

*William H. Sorrell,* Attorney General, Montpelier, *Martha E. Csala,* Assistant Attorney General, Waterbury, and *Bridget C. Asay,* Assistant Attorney General, Montpelier, for Respondent-Appellant.

¶ 1. **Burgess, J.** The Department for Children and Families (DCF) challenges the Human Services Board's reversal of its determination that petitioners M.G. and K.G. placed their children at risk of harm by having an illicit drug laboratory in their residence. The Board ruled that the parents should be removed from DCF"s child-abuse-and-neglect registry for lack of actual harm. Because the Board failed to make any findings of fact, we reverse and remand for additional proceedings.

¶ 2. We begin with a brief overview of the registry process.[1] By statute, DCF must investigate reports of child abuse and neglect and maintain a registry that contains a record of all investigations that have resulted in a "substantiated report." 33 V.S.A. §§ 4915-4916. The information contained in the registry may be disclosed only to individuals and entities specified by statute. *Id.*

---

[1] We note that the laws governing the registry process have changed since DCF substantiated petitioners here. See 2007, No. 168 (Adj. Sess.). We apply the law as set forth in 2007, No. 77, and all statutory references are to such laws, unless otherwise noted.

§§ 4916(c)-(d), 4919. A substantiated report is one that is "based upon accurate and reliable information that would lead a reasonable person to believe that the child has been abused or neglected." *Id.* § 4912(10). An "abused or neglected child" includes a child. "whose physical health, psychological growth and development or welfare is harmed or is at substantial risk of harm by the acts or omissions of his or her parent." *Id.* § 4912(2). "Risk of harm" is in turn defined as a "significant danger that a child will suffer serious harm other than by accidental means, which harm would be likely to cause physical injury, neglect, emotional maltreatment or sexual abuse." *Id.* § 4912(4).

¶ 3. With this in mind, the record indicates the following history. In October 2007, police and federal drug agents raided petitioners' home and discovered numerous chemicals and other related materials that can be used to manufacture methamphetamine and ecstasy. Petitioners' children were one and three years old at the time. Following an investigation, DCF determined that petitioners had placed their children at risk of harm by establishing a clandestine drug laboratory in the basement of their home. DCF thus informed petitioners that their names would be included in its registry.

¶ 4. Petitioners requested an administrative review of this decision. See *id.* § 4916a(c). Following a review meeting with petitioners and their attorney, the reviewer upheld DCF's determination. In reaching her decision, the reviewer cited the applicable legal standards, including the definition of "substantiated report" and "risk of harm." She also cited the applicable DCF policies for cases involving the production of methamphetamine. See Vermont Dep't for Children & Families, Family Services Div., Family Services Policy Manual, Policy No. 55, at 5 (effective Jan. 1, 2007) (report of abuse "should be substantiated if a reasonable person would believe that . . . through action or inaction by the parent or caretaker, the child was exposed to methamphetamine production"), available at http://dcf.vermont.gov/sites/dcf/files/pdf/fsd/policies/55__Risk_of_Harm__Final_1-07.pdf; Vermont Dep't for Children & Families, Family Services Div., Family Services Policy Manual, Policy No. 63, at 1 (effective Jan. 25, 2007) (defining "clandestine lab" as "[a] covert or secret illicit operation containing a combination of apparatus and chemicals that has been or could be used to make controlled substances"), available at http://dcf.vermont.gov/sites/dcf/files/pdf/fsd/policies/63_Meth_Interim_1-07_a.pdf.

¶ 5. The reviewer found that the materials for the drug lab were located in the basement of petitioners'. home in close proximity to the family's washer and dryer. While father M.G. claimed that the children did not play in the basement and that the basement was used for storage of their toys, clothing, and other household goods, he could not explain why toys were found on the floor of the basement near the washing machine. Father admitted that the washer and dryer were used several times per week. While the door at the top of the stairs to the basement was kept locked, the door could not be locked from the inside, thus giving access to the basement by the children when one or both parents were in the basement. The reviewer found that the chemicals discovered in the home were extremely dangerous and very easily could have contaminated clothing, toys and the home in general. She found that physical injury to the children would have been serious. Thus, based on her review of all the available information, including additional information not discussed here, the reviewer found that the legal and policy standards were met and that petitioners' names should be included in the registry.

¶ 6. Petitioners appealed from this decision to the Human Services Board. See 33 V.S.A. § 4916b. An investigating police officer present during the drug raid was the only witness to testify at the fair hearing. He stated that the type of chemicals found in the home indicated a clear intent to produce either methamphetamine or ecstasy or both. He indicated that petitioners had "everything for a meth lab without any question." He later clarified that while petitioners did not have a "significant quantity" of ephedrine in the home, they did have enough to make a single dose of methamphetamine.

¶ 7. The officer also described the methamphetamine manufacturing process and explained the risks and hazards associated with the chemicals found in petitioners' home, including the risk of using otherwise-legal chemicals in a manner not anticipated by their manufacturer. More specifically, he detailed the inhalation hazards and explosive hazards associated with the manufacture of methamphetamine. The officer stated that the house was dangerous to its occupants given the presence and the combination of the chemicals in question. In addition to the officer's testimony, the parties stipulated that certain photographs of the home, an inventory of items found during the drug raid, and a diagram of the home would be admitted as evidence, as well as the facts

contained in DCF's summary of its investigation, with the understanding that any legal conclusions were subject to dispute in the case.

¶ 8. The parties later filed proposed findings of fact and conclusions of law. DCF asserted in part that the uncontradicted evidence showed that all of the chemicals required for the creation of methamphetamine were present in petitioners' home; there were also manuals and recipes for methamphetamine and ecstasy and glass equipment and cookers required for the creation of these substances. DCF reiterated that most of the chemicals and equipment were found in the basement of petitioners' home; the basement area was not locked and there was a photograph of a child's toy on the floor of the basement adjacent to a "cooker" and in the vicinity of the poisonous, gaseous, and combustible chemicals. DCF pointed to the officer's testimony that the house was dangerous and argued that the evidence plainly established that petitioners had created a clandestine methamphetamine laboratory in their home. Even assuming arguendo that petitioners had not yet started to create illegal substances, DCF asserted that the particular grouping of chemicals found in petitioners' home created a risk of harm to their children from ingestion, contamination and explosion.

¶ 9. Petitioners argued, in response, that DCF failed to prove that the children were ever actually at risk of harm. They pointed to DCF's statement that it was unknown whether drug manufacturing (cooking) had previously occurred in the residence. They also noted that, with one possible exception, the chemicals they possessed could be easily and legally purchased, and there was no evidence to show that the chemicals were improperly stored. Petitioners acknowledged the possibility that the children's clothing could have been contaminated, but they argued that there was no evidence to show that the clothing was actually contaminated. Contrary to DCF's assertion, moreover, petitioners maintained that they did not have all the chemicals needed to make methamphetamine, although they acknowledged there was some ephedrine, an ingredient in common cold medications as well as a necessary ingredient in the making of methamphetamine, in the home's upstairs bathroom. They argued that there was no evidence that the small amount of ephedrine was intended to make methamphetamine, and thus, the State failed to show that petitioners possessed the essential ingredients for the manufacture of methamphetamine.

¶ 10. The hearing officer filed his written recommendations in July 2009. In reaching his conclusion, the hearing officer did not make any findings of fact, but rather began his decision by stating that "[t]he following facts have been submitted by [DCF] in its Proposed Findings." These "facts" included a recitation of the police officer's testimony that: "all the chemicals required for the creation of methamphetamine were present in the home"; and that "the house and the chemicals stored therein created a dangerous situation for occupants of the home due to the combustibility of the chemicals and the gases that may or were given off by the chemicals in their stored state as well as gases given off in the cooking process of drug production." Another "fact" submitted by DCF, and recited by the hearing officer, was that the quantity and array of chemicals in petitioners' home, as well as the manual and notes for the production of methamphetamine, provided "uncontradicted evidence of a clandestine methamphetamine lab." After reciting DCF's proposed findings, the hearing officer noted petitioners' response that all the chemicals found in their basement were legal for them to possess and that, although some of the chemicals were dangerous, there was no evidence or allegation that they were stored improperly or that the parties' children were ever exposed to them or had been in the vicinity of these chemicals unsupervised.

¶ 11. The hearing officer then concluded that DCF failed to prove that the children were at risk of harm. He explained that DCF had substantiated petitioners because they created a "clandestine lab" to manufacture a controlled substance, which constituted a risk of harm to their children from "ingestion, contamination and explosion." DCF conceded, however, that there was no evidence that petitioners' enterprise ever advanced to the stage of actual production of any controlled substance. At most, the hearing officer reasoned, it might be concluded that petitioners intended to manufacture drugs, but were foiled primarily, if not solely, by timely police action. The hearing officer concluded that the mere presence of dangerous chemicals in their basement, whatever the intent for their ultimate use, did not satisfy the statute. The hearing officer thus recommended that DCF's decision be reversed.

¶ 12. DCF filed written objections, arguing, among other things, that the hearing officer failed to make actual findings of fact. In its argument before the Board, DCF again reiterated that no

findings of fact had been made, including a key finding as to whether a methamphetamine lab had been established. DCF noted, moreover, that its policy did not require that production of drugs actually begin before a risk of harm could be found. Notwithstanding these objections, the Board adopted the hearing officer's recommendations verbatim. This appeal by DCF followed.

¶ 13. DCF acknowledges in its brief that the Board did not make its own findings as statutorily required. Nonetheless, DCF maintains that the Board appears to have adopted DCF's proposed findings as its own. We are not so persuaded and hold that the Board's failure to make findings requires reversal.

■ ¶ 14. By statute, the Board or the hearing officer must "issue written findings of fact," and the Board must "enter its order based on the findings." 3 V.S.A. § 3091(c). The Board failed to meet this obligation here. Its mere recitation of the evidence does not suffice. "[A]s we have stated on numerous occasions, a recitation of evidence in findings is not a finding of the facts contained in the testimony related and it cannot be so construed." *In re Hale Mountain Fish & Game Club, Inc.*, 2007 VT 102, ¶ 9, 182 Vt. 606, 939 A.2d 498 (mem.) (citing *Krupp v. Krupp*, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967) (quotation and additional citation omitted)); accord *In re E.C.*, 2010 VT 50, ¶ 14, 188 Vt. 546, 1 A.3d 1007 (mem.) (reiterating that "a mere recitation of testimony is not the equivalent of a finding of the facts contained in that testimony"). Inadequate and commonly referred to as "*Krupp* findings," such recitations of evidence, which are not adopted by the court as fact, "cannot form the basis for a decision." *In re E.C.*, 2010 VT 50, ¶ 14.

■ ■ ¶ 15. Among other key findings missing, the Board failed to determine if petitioners had established a clandestine drug laboratory in their home and whether they had all of the materials necessary to make methamphetamine. While it appears that petitioners "could" have manufactured methamphetamine with the materials found in the home, petitioners claimed that they had no intent to use the ephedrine found in the upstairs bathroom to do so. The Board made no findings as to petitioners' intent or whether the materials upstairs were part of the drug laboratory. The import of any such findings is yet to be determined, and we do not here consider whether the Board erred in holding that petitioners must actually begin cooking methamphetamine before

they can be substantiated for placing their children at risk of harm.[2] The Board could not properly assess the risk of harm subject to review by this Court without first determining the facts. Thus, because the Board's conclusion is unsupported by any findings, we reverse and remand for additional proceedings.

*Reversed and remanded.*

---

[2] We do note, however, that the Board should have considered DCF's policy standards for cases involving methamphetamine labs in reaching its conclusion. See *In re R.H.*, 2010 VT 95, ¶ 29, 189 Vt. 15, 14 A.3d 267 ("DCF is the agency responsible for the administration of the registry statutes, and its interpretation must be followed absent compelling indications of error.").