NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 43

No. 2016-170

| | |
|---|---|
| In re North East Materials Group, LLC Amended Act 250 Permit (Russell Austin, Pamela Austin, Julie Barre, Marc Bernier, et al., Collectively, Neighbors for Healthy Communities, Appellants) | Supreme Court<br><br>On Appeal from Superior Court, Environmental Division<br><br>October Term, 2016 |

Thomas G. Walsh, J.

Laura B. Murphy and Douglas A. Ruley, Environmental and Natural Resources Law Clinic, South Royalton, for Appellants.

Alan P. Biederman of Biederman Law Office and James P.W. Goss of Facey Goss & McPhee, P.C., Rutland, for Appellees.

PRESENT: Dooley, Skoglund, Robinson and Eaton, JJ., and Carlson, Supr. J., Specially Assigned

¶ 1. **SKOGLUND, J.** Neighbors for Healthy Communities (neighbors) appeal the Environmental Division's decision granting North East Materials Group, LLC, (NEMG) an Act 250 permit for operating an asphalt plant. Neighbors specifically challenge the court's findings and conclusions under Criterion 5 and Criterion 8 of Act 250, claiming that conditions imposed by the court pursuant to these two criteria repeat existing requirements that NEMG did not or could not comply with and, thus, were insufficient to meet Act 250's criteria. We affirm.

¶ 2. Pursuant to a permit approved by the District Five Environmental Commission in January 2013, NEMG constructed a hot-mix asphalt plant on the Rock of Ages quarry tract in Barre, Vermont. Neighbors appealed the permit to the Environmental Division and NEMG cross-appealed. Prior to trial, neighbors and NEMG stipulated to a limited review of NEMG's permit to

ensure it complied with Act 250; specifically, neighbors sought examination of air pollution controls under Criterion 1, traffic concerns under Criteria 5 and 9(k), and aesthetics under Criterion 8.

¶ 3. The Environmental Division conducted a three day hearing on the permit in early May 2015 and found the following general facts. The asphalt plant is on the south side of Graniteville Road, one of the roads that bisects the Rock of Ages property. This site is close to the village of Upper Graniteville, which is mostly residential, and the village of Lower Graniteville, which is a mix of businesses and residences. The asphalt plant is a batch-type plant, meaning hot-mix asphalt is not stored for extended periods of time but is made on an as-needed, per-truck-load basis. Between the plant's construction in the summer of 2013 and the May 15, 2015 hearing, the plant had two operating seasons. An operating season extends from May 1 through mid-November, from 6 a.m. to 4 p.m. six days a week. The approved maximum operating capacity of the plant is 180 tons of asphalt per hour, with a rolling average production limit of 4500 tons per week during any given 45-day period.

¶ 4. After making these general findings, the Environmental Division made specific findings and conclusions of law related to the Act 250 criteria challenged by neighbors. Ultimately, the court affirmed the district commission's approval of the permit but imposed two conditions addressing unsafe traffic conditions under Criterion 5 and one condition to mitigate undue adverse odors under Criterion 8.

¶ 5. On appeal, neighbors challenge the viability of these three conditions, broadly arguing that the new conditions repeat existing requirements that NEMG did not or could not comply with and, thus, were insufficient to meet Act 250's criteria.[1]

---

[1] On appeal, neighbors do not challenge the Environmental Division's conclusion that the asphalt plant will not cause undue air pollution under Criterion 1, that it will not have undue adverse visual or sound impacts under Criterion 8, and that it will not materially jeopardize public investment in highways under Criterion 9.

¶ 6.    To be clear, this matter is not an enforcement action.  Act 250 vests the Natural Resources Board (NRB) and the Agency of Natural Resources (ANR) with the power to enforce compliance with Act 250 permits.   See 10 V.S.A. § 6027(g) (authorizing NRB to "initiate enforcement" of Act 250 permits and to "petition the Environmental Division for revocation" of Act 250 permits for, among other things, "noncompliance with any permit or permit condition"); id. § 8003 (stating NRB has discretion to institute enforcement actions); id. § 8004 (providing that NRB and ANR act cooperatively to enforce Act 250).  A district commission does not possess the authority to determine whether violations of Act 250 permits exist or to initiate enforcement actions.  In re Treetop Dev. Co. Act 250 Dev., 2016 VT 20, ¶ 14, __ Vt. __ 143 A.3d 1086.

¶ 7.    Instead, the district commission's authority "is limited to considering permit applications in the context of [Act 250's] ten statutory criteria and either approving or denying the application," as well as amending permits.  Id.  Similarly, when reviewing a permit granted by a district commission, the Environmental Division may consider the statutory criteria and affirm the issuance of a permit contingent on new "conditions and requirements mitigating the impact of particular development."  In re North East Materials Grp. LLC Act 250 JO # 5–21, 2015 VT 79, ¶ 27, 199 Vt. 577, 127 A.3d 926.  Thus, the question before us is whether the Environmental Division's findings support the court's conclusion that the conditions imposed would mitigate the adverse impacts of the plant's traffic and odor,[2] not whether the project failed to comply with a permit condition.

_____

[2] Neighbors frame the question somewhat differently on appeal and claim that "[t]his Court has not addressed the precise question of when a condition is insufficient to ensure compliance with Act 250."  But framing the claim in this manner ignores the standard of review set forth by this Court; that is, a permit condition is insufficient under Act 250 if it is not reasonable in light of the Environmental Division's findings and if those findings and conclusions are clearly erroneous.  See In re Shantee Point, Inc., 174 Vt. 248, 263, 811 A.2d 1243, 1255 (2002); In re Denio, 158 Vt. 230, 240, 608 A.2d 1166, 1172 (1992). The Environmental Division cases cited by applicant adopt a similar position: the imposition of reasonable conditions is dependent on the sufficiency of the Environmental Division's findings of facts and conclusions.  For example, in In re McClean Enterprises Corp., the court denied the applicant's permit and noted that "the evidence indicates the Permitee cannot comply with the conditions.  In re McLean Enters. Corp., No. 2S1147–1–EB, slip      op.      at      62      (Vt.      Envtl.      Bd.      Nov.      24,      2004)      (emphasis      added),

3

¶ 8. This is a question we review deferentially, unlike the court's legal conclusions, which we review de novo. See In re Route 103 Quarry, 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694 (noting that review of Environmental Division's decision is "limited" and that appellants "must overcome a deferential standard of review to prevail on their challenge to the findings and conclusions underlying the court's decision"); In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 21, 199 Vt. 19, 121 A.3d 630 ("Although we review the environmental court's legal conclusions de novo, we will uphold those conclusions if they are reasonably supported by the findings." (citation and quotation omitted)).

¶ 9. Further, any conditions imposed must be reasonable in light of the Environmental Division's findings. In re Denio, 158 Vt. 230, 240, 608 A.2d 1166, 1172 (1992). We will not upset those findings unless, "taking them in the light most favorable to the prevailing party, they are clearly erroneous." In re Shantee Point, Inc., 174 Vt. 248, 263, 811 A.2d 1243, 1255 (2002). Moreover, the Environmental Division's findings "will not be disturbed merely because they are contradicted by substantial evidence; rather, [an appellant] must show that there is no credible evidence to support them." In re Miller Subdivision Final Plan, 2008 VT 74, ¶ 13, 184 Vt. 188, 955 A.2d 1200 (emphasis added).

¶ 10. With this standard in mind, we examine the Environmental Division's specific findings and conclusions of law relating to traffic under Criterion 5 and undue adverse odors under Criterion 8.

---

http://www.nrb.state.vt.us/lup/decisions.htm; see also, e.g., In re Rivers Development Act 250 Appeal, No. 68-3-07 Vtec, slip op. at 1 (Vt. Envtl. Ct. Aug. 17, 2010), https://www.vermontjudiciary.org/GTC/Environmental/Opinions.aspx [https://perma.cc/CXZ8-CAR9] (revisiting factual findings and conclusions and declining to grant applicant's post-judgment amendment request); In re O'Neil Sand & Gravel Act 250 Amendment Application, No. 48-2-07 Vtec, slip op. at 12 (Vt. Envtl. Ct. Feb. 23, 2010), https://www.vermontjudiciary.org/GTC/Environmental/Opinions.aspx [https://perma.cc/ZGL8-GN88] (observing applicant submitted no credible evidence to refute charge that noise violated condition of permit).

I. Criterion 5—10 V.S.A. § 6086(a)(5)

¶ 11.　Under 10 V.S.A. § 6086(a)(5)(A), before issuing a permit, the district commission must determine that a project "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." Pursuant to this provision, the Environmental Division made the following findings.

¶ 12.　The hot-mix asphalt manufactured in the plant is sold and transported off the Rock of Ages quarry site in trucks not owned by NEMG. Two types of trucks transport the asphalt: large dump trucks, which are most common, and long, gondola-type trucks similar in length to tractor-trailer trucks, which are less common.

¶ 13.　Currently, the trucks may enter the property only at the main quarry entrance, on the northern end of the property. This entrance is on Graniteville Road, between Upper and Lower Graniteville. Trucks exiting through this northern entrance must turn left, or northwest, onto Graniteville Road and follow the road through Lower Graniteville to reach Vermont Route 14, U.S. Route 302, or Vermont Route 110. This route has been designated a truck route by Barre.

¶ 14.　A second access point is planned at Pirie Road, to the south of the main quarry entrance. Once open, trucks will enter the property via Pirie Road and then continue north through internal quarry roads until they reach the plant. Trucks exiting through this southern access point will either be able to turn south onto Pirie Road and continue onto Vermont Route 14 or turn north onto Pirie Road, which eventually turns into Baptist Street and joins with Graniteville Road in Lower Graniteville.

¶ 15.　The point at which Baptist Street joins Graniteville Road in Lower Graniteville is a three-way junction. To stay on Graniteville Road at this junction, trucks leaving the quarry via the northern entrance must take a sharp right curve to the north. By contrast, trucks approaching from the planned southern exit via Baptist Street would simply continue straight to merge with Graniteville Road. Vehicles approaching the junction from either direction have sufficient sight

lines to observe other vehicles and stop in time; these sight lines comply with standards for roadway designs.

¶ 16. During the periods of 2003-2007 and 2008-2012, the Vermont Agency of Transportation designated a 0.3 mile section of the curve along Graniteville Road near the junction with Baptist Street a high crash location (HCL). An HCL designation is a screening device used by transportation agencies to identify road sections that are suitable for further analysis; currently, there are 600 such designations in Vermont. To be designated an HCL, a location must have experienced five or more accidents over a five-year period. In the period from 2008-2012, for example, five accidents occurred in the Graniteville Road HCL: three were not related to the sharp curve and the two connected to the sharp curve did not involve trucks.

¶ 17. The HCL portion of Graniteville Road is two paved lanes with narrow shoulders and no sidewalks. A telephone pole on the roadside limits vehicle use of the shoulders. Neighbors submitted a video demonstrating that, to safely negotiate turning right to stay on Graniteville Road, two tractor-trailer-sized trucks crossed the double yellow center line and briefly entered the oncoming lane. After viewing the video, NEMG's expert conceded that the tractor-trailer-sized trucks had crossed the center line, but noted that the two trucks cleared the right shoulder by some distance and that it was not clear "that he could not make it." No evidence was submitted that dump-truck-sized trucks, which are the trucks most frequently employed to haul asphalt, must cross the center line to negotiate the sharp right turn. And, in fact, NEMG's expert testified that a dump truck would most likely not encroach on the other lane. Moreover, the expert noted that the clear sight lines lessened any safety concern caused by the sharp curve.

¶ 18. Fifteen million vehicles traveled through the Graniteville Road HCL since 2003, including trucks transporting asphalt from the plant and other similarly-sized trucks serving the Rock of Ages quarry and other businesses. Dating back to 2003, no record exists of a truck being involved in an accident within the HCL section of Graniteville Road.

6

¶ 19.   Having made these findings, the Environmental Division held that trucks crossing over the center line posed a danger to other motorists, bicyclists, and pedestrians using the road and, as a result, violated Criterion 5.   In doing so, the Environmental Division first rejected neighbors' contention that adding traffic to an HCL per se exacerbates an already unsafe condition. The court noted that an HCL designation does not mean that a section of road is per se unreasonably dangerous; rather, the designation is merely a screening device for further analysis. Further, the court distinguished the facts in this case from In re Pilgrim Partnership, 153 Vt. 594, 572 A.2d 909 (1990).[3]   Because the underlying cause of the unsafe condition in this case was the road's geometry, not traffic congestion, the court determined that Pilgrim Partnership's analysis of unsafe traffic congestion did not apply.   But the court did conclude that neighbors provided sufficient evidence to demonstrate that tractor-trailer-sized trucks transporting asphalt from the plant would cross the center line and that this was an unsafe traffic condition under Criterion 5.

¶ 20.   To mitigate this unsafe effect, the Environmental Division imposed two conditions:

> 1.  When using public roads, trucks associated with the [plant] will remain in their lane of travel at all times, including when traveling on the sharp curve in Graniteville Road at the intersection of Graniteville Road and Baptist Street.
>
> 2.  [NEMG] must pay to have the centerline of the HCL section of Graniteville Road painted each spring, to make it clear to drivers and observers where the centerline of the road is.

The court noted that the first condition mirrored Vermont state law precluding vehicles from crossing the center line.  See 23 V.S.A. § 1031.  By adding this condition, according to the court,

---

[3]  Neighbors largely abandon their focus on In re Pilgrim Parnership on appeal, except to state that our holding was that "[e]xacerbating [an] existing traffic hazard by allowing additional travel on [the] road would be detrimental to the public interest."  153 Vt. 594, 596-97, 572 A.2d 909, 910-11 (1990).  As we stated recently, however, in In re Pilgrim Partnership we affirmed the reasonableness of the court's conclusion that an increase in traffic contributed to unsafe congestion and, as result, supported reasonable conditions to alleviate the additional burden created.  See In re Costco Stormwater Discharge Permit, 2016 VT 86, ¶ 17, __ Vt. __, 151 A.3d 320.  To reiterate, our holding in In re Pilgrim Partnership did not establish a per se rule requiring mitigation in certain circumstances under Criterion 5; instead, we affirmed the reasonable conditions imposed by the court based on the factual findings and conclusions made in that case.  In re Costco, 2016 VT 86, ¶ 17.

any truck crossing the center line would be in violation of the plant's Act 250 permit as well as state law. The second condition was added to aid in enforcement of the first condition.

¶ 21. As noted above, under 10 V.S.A. § 6086(a)(5)(A), the district commission or Environmental Division must find that a project "[w]ill not cause unreasonable congestion or unsafe conditions with respect to use of the highways." The party opposing the applicant bears the burden of proof, id. § 6088(a), but the applicant bears the burden of production to establish at least a "prima facie case" of compliance. In re Champlain Parkway Act 250 Permit, 2015 VT 105, ¶ 15, 200 Vt. 158, 129 A.3d 670. A permit may not be denied solely on the basis of traffic impacts; however, the Environmental Division may impose reasonable conditions "to alleviate the burdens created" by traffic. 10 V.S.A. § 6087(b); see also id. § 6086(c) ("A permit may contain such requirements and conditions as are allowable proper exercise of the police power . . . .").

¶ 22. Given these standards, we conclude that credible evidence sufficiently supported the trial court's findings and conclusions under Criterion 5. In re Miller Subdivision Final Plan, 2008 VT 74, ¶ 13 (noting Environmental Division's findings "will not be disturbed merely because they are contradicted by substantial evidence; rather, [an appellant] must show that there is no credible evidence to support them"). The Environmental Division relied on neighbors' video evidence to find that, in the past, tractor-trailer sized trucks crossed the center line to negotiate the HCL curve and that this constituted a danger to motorists, bicyclists, and pedestrians. In addition to the video evidence, the court's findings relied on the expert's interpretation of the video submitted by neighbors. Although the expert conceded that the trucks in the video had crossed the center line, the expert noted that the tractor-trailer-sized trucks in the video appeared to have room on the right shoulder to make the sharp curve and later opined that dump trucks could negotiate the curve without encroaching on the other lane. As a result, the Environmental Division did not conclude that tractor-trailer sized trucks could not negotiate the sharp curve nor did the court determine that dump trucks crossed the center line. In fact, the court found no evidence supporting the claim that dump trucks crossed the center line and found that dump trucks are the more typical

8

truck used by customers of the plant. The court's only conclusion was that tractor-trailer-sized trucks crossed the center line and posed a danger. This evaluation and conclusion was well within the Environmental Division's "broad discretion to assess the credibility of the witnesses and the persuasive value of the evidence." In re Costco Stormwater Discharge Permit, 2016 VT 86, ¶ 14, __ Vt. __, 151 A.3d 320.

¶ 23. Confronted with the safety concern posed by tractor-trailer-sized trucks, the court imposed a condition precluding all trucks from crossing the center line and another condition aiding enforcement. In doing so, they expressly placed a new condition in NEMG's Act 250 permit that mirrors state law and one that, based on the evidence, will mitigate the potential harm as long as the trucks comply with the condition. Given that the evidence presented was sufficient to support the court's factual findings and conclusion, and that the condition, if complied with, will prevent the potential harm, the condition was a reasonable exercise of the court's police power. See 10 V.S.A. § 6087(b), (c); In re Denio, 158 Vt. at 240, 608 A.2d at 1172. Similarly, the second condition imposed by the court—requiring NEMG to pay to have the centerline painted each spring—was a reasonable condition because it aids enforcement in two ways: it presents a fresh warning to truck drivers during the plant's operating season and it allows other parties to monitor compliance with the first traffic condition.

¶ 24. Neighbors claim that, because the condition requiring trucks to stay right of the center line is already mandated by law, it adds "nothing" and, as a result, does not ensure that Criterion 5 will be met. We disagree for several reasons. First, as described above, there is no evidence that all trucks moving to and from the plant cross the center line, nor is there evidence that tractor-trailer-sized trucks must always cross the center line to negotiate the curve. Second, adding the condition to the Act 250 permit subjects NEMG to enforcement action if the trucks do not comply. The focus of the condition is not on the truck drivers, who are the parties bound by state law, but on NEMG, which is now subject to the center line restriction in its Act 250 permit. Absent this condition, NEMG would not be responsible for how the trucks negotiated the turn.

9

Finally, it is undisputed that, if the trucks comply with the conditions, the unsafe traffic impact identified by the Environmental Division will not occur. Thus, the condition ensures compliance with Criterion 5 by subjecting NEMG to possible enforcement actions if trucks cross the center line.

¶ 25. Similarly, we reject neighbors' argument that the court should have imposed the alternative means of ensuring compliance with Criterion 5 that neighbors' expert suggested. Our review is concentrated on whether the conditions imposed are reasonable in light of the Environmental Division's findings and conclusions. In re Denio, 158 Vt. at 240, 608 A.2d at 1172. The availability of alternate conditions does not influence our analysis as long as the conditions imposed by the court satisfy this standard.

II. Criterion 8—10 V.S.A. § 6086(a)(8).

¶ 26. Under Act 250, a proposed project may "not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). To determine whether the plant caused undue adverse odors,[4] the Environmental Division made the following findings based on the evidence.

¶ 27. The liquid asphalt is stored in a sealed tank at a temperature below vaporization level. The tank has a small vent equipped with a carbon activated filter to eliminate offsite odors. Because it is a batch-type plant, the plant provides most of the hot-mix asphalt on demand, which reduces odors. In addition, the permit limits the hours and months that the plant may be operated, as well as the maximum amount of asphalt that may be produced. Specifically, the plant operates from May 1 through mid-November, 6 a.m. to 4 p.m., six days a week. The approved maximum operating capacity of the plant is 180 tons of asphalt per hour, with a rolling average production limit of 4500 tons per week during any given 45-day period.

---

[4] The Environmental Division determined that the truck traffic did not cause undue adverse odors, and neighbors do not appeal this determination.

10

¶ 28. Despite these precautions, during operation, the plant causes perceptible asphalt odors on neighbors' properties and inside their homes, if they leave the windows open or air conditioners running. Even though the industrial Rock of Ages quarry has operated in the area for an extended period of time, these petrochemical odors are new to the area.

¶ 29. Several neighbors testified that these odors are pungent, eye-watering, and throat-stinging. During the summer operating months, the odor permeates their properties, causing neighbors to forgo outdoor recreation. For example, one neighbor testified that he smelled the asphalt odors whenever the plant was operating and that he no longer walks after work because of the odors. This neighbor also testified that he could smell the fumes on days when the plant was not operating, although the odor had dissipated, and speculated that this odor related to the hot-mix asphalt stored on site.

¶ 30. On the other hand, the Environmental Division found that several neighbors who testified were hypersensitive to odors. In addition, the court noted that some of the days neighbors testified that odors occurred did not correspond to days when the plant operated. Finally, although neighbors testified that they contacted enforcement agencies to investigate the fumes and that agents came to one of the neighbor's houses, the court noted that no enforcement actions had been initiated.

¶ 31. Based on these findings, the Environmental Division concluded that "the odors and fumes from the asphalt plant itself may be adverse and undue" under the familiar two-step Quechee test. See In re Rinkers, Inc., 2011 VT 78, ¶ 9, 190 Vt. 567, 27 A.3d 334 (mem.) (applying test of In re Quechee Lakes Corp., Nos. 3W0411–EB & 3W0439–EB, slip op. at 17–18 (Vt. Envtl. Bd. Nov. 4, 1985), http://www.nrb. state.vt.us/lup/decisions/1985/3w0439-eb-fco.pdf). Although the court questioned the credibility of neighbors' more extreme accounts of off-site odors, it found that the plant caused perceptible odors on the neighbors' properties and inside their homes. In addition, these new odors were not in harmony with the area, even with the area's history of quarrying, and, as result, were adverse.

11

¶ 32. Addressing whether the odors were undue, the court noted that no clear, written community standard existed to preserve the aesthetic smells in the area and that NEMG had taken appropriate mitigating steps to improve the plant's harmony with its surroundings, such as operating as a batch-type mix plant with reasonably limited hours and months of operation. Further, the court rejected neighbors' proposed mitigation measure—resiting the project—because neighbors did not introduce evidence as to the feasibility of the alternative. Despite this, the court found that the fumes "may be shocking or offensive to the average person." In making this determination, the Environmental Division relied, not on the testimony of some hypersensitive neighbors, but on the credible testimony of other neighbors who described the pungent odors.

¶ 33. Having determined that the plant may cause undue adverse odors under Criterion 8, the Environmental Division imposed the following condition:

> 3. [NEMG] shall not discharge, cause, suffer, allow, or permit from any source whatsoever such quantities of air contaminants or other material which will cause injury, detriment, nuisance or annoyance to any considerable number of people or to the public or which endangers the comfort, repose, health or safety of any such persons or the public or which causes or has a natural tendency to cause injury or damage to business or property. [NEMG] shall not discharge, cause, suffer, allow, or permit any emissions of objectionable odors beyond the property line of the premises.

¶ 34. The court noted that this condition mimicked Condition 22 of NEMG's air pollution permit. In addition, the court found that "NEMG testified that it can and does comply with this condition." Given this testimony, the court concluded that the sensibilities of the average person would not be offended or shocked by the plant's operation with the condition, because the condition forbade the odoriferous impacts and NEMG complied with the condition.

¶ 35. Neighbors challenge this determination on appeal. Like the plant's traffic impacts, they do not dispute the court's conclusion that the fumes were undue and adverse, but instead argue that the evidence demonstrates that NEMG has not and cannot comply with this condition. In particular, they claim that this condition was already part of NEMG's Act 250 permit and, because

12

the court found undue and adverse impacts after two years of the plant's operation, the evidence is clear that NEMG could not comply with the condition.

¶ 36. Once the Environmental Division has determined that a proposed project causes undue adverse impacts under Criterion 8, the court must impose reasonable conditions to ensure the project complies with the criteria. In re Treetop, 2016 VT 20, ¶ 12; see also 10 V.S.A. § 6086(c) ("A permit may contain such requirements and conditions as are allowable proper exercise of the police power . . . ."). The party opposing the applicant bears the burden of proof to demonstrate undue adverse impacts, 10 V.S.A. § 6088(b), but the applicant bears the burden of production to establish at least a "prima facie case" of compliance. In re Champlain Parkway, 2015 VT 105, ¶ 15.

¶ 37. First, it is undisputed that, if complied with, the condition will prevent the undue adverse impacts at issue. The Environmental Division concluded that the condition, "if complied with, will adequately address [neighbors'] concerns over the odors from the hot-mix Project under Criterion 8, because it forbids the impacts [neighbors] complain of." In coming to this conclusion, the court relied on the testimony of NEMG's expert regarding the plant's air pollution permit, who stated that the plant was in compliance with the air pollution permit. Because the air pollution permit expressly precluded "objectionable odors beyond the property line of the premises," the court's conclusion that compliance also included preventing objectionable odors beyond the premises property line was supported by testimony. Given that the evidence presented was sufficient to support the court's imposition of the condition, and that the court found that NEMG could comply with the condition, the condition was a reasonable exercise of the court's police power and adequately addressed the concerns under Criterion 8. 10 V.S.A. 6087(b); In re Denio, 158 Vt. at 240, 608 A.2d at 1172.

¶ 38. It is the ability to comply that compels the court's decision. If there is a violation of the permit, an enforcement action is the appropriate remedy. The statutory structure of Act 250 vests enforcement in the NRB and the ANR. And, while the Environmental Division stated that

13

the importation of the air permit condition was "incorporate[d]" into the Act 250 permit, this condition was also part of the land-use permit originally granted by the District Five Environmental Commission. Thus, the presence of this condition in the permit provided the NRB or ANR with the authority to "initiate enforcement" if NEMG did not comply with the permit condition. See 10 V.S.A. § 6027(g); id. § 8003 (stating that NRB has discretion to institute enforcement actions); id. § 8004 (providing that NRB and ANR act cooperatively to enforce Act 250). Despite this enforcement ability and the clear evidence that agents visited with neighbors during periods when the odors allegedly occurred, the Environmental Division found that no enforcement action occurred. Thus, if we were to allow neighbors to challenge this condition, the imposition of which is supported by credible evidence, we would allow neighbors to circumvent the enforcement process and effectively allow the Environmental Division to initiate enforcement actions without initiation by the NRB and ANR. Contra In re Treetop, 2016 VT 20, ¶ 14. Such a determination would contravene Act 250's structure.

Affirmed.

FOR THE COURT:

_____

Associate Justice

¶ 39.  **ROBINSON, J., concurring in part, dissenting in part.**  After concluding that the asphalt plant caused undue adverse impacts during its first two seasons of operation, the trial court granted NEMG an Act 250 permit with no new conditions or measures to mitigate the aesthetic harm recognized in the court's own findings. It essentially reasoned that if the plant stopped causing undue adverse impacts, there would be no undue adverse impacts. If it continued to cause undue adverse impacts, then that conduct could be addressed in an enforcement action. Because it fails to condition the permit on NEMG's taking actual reasonable mitigating measures in the face of established undue adverse impacts, the trial court's decision runs afoul of the

14

requirements of Act 250. I respectfully dissent from the majority's analysis with respect to the aesthetic impact of the asphalt plant odors.[5]

¶ 40. There is no dispute that the odors from the asphalt plant, emitted while the plant was subject to the same condition the trial court relied on for mitigation, created undue adverse impacts. Accordingly, NEMG had an obligation, as a prerequisite to its permit, to establish reasonable conditions that would mitigate those impacts. The trial court's findings, and the underlying evidence, do not support the contention that the condition imposed by the trial court is reasonably likely to mitigate the undue adverse impacts. The consequence of the trial court's mode of analysis is to shift to the enforcement process matters that, by law, are supposed to be addressed at the permitting stage. I consider each of these points in more detail.

¶ 41. Two critical foundational facts are not in dispute. First, nobody denies that the plant has operated for two years, and has done so pursuant to an Air Permit issued by the Agency of Natural Resources that requires that NEMG "shall not discharge, cause, suffer, allow, or permit any emissions of objectionable odors beyond the property line of the premises." This is not like many cases in which the parties and court must try to anticipate the likely effects of a yet-to-be-implemented project. The court below based its analysis in part on the observed operations of the project, pursuant to the conditions in place during those operations.

¶ 42. Second, there is also no dispute that during this period of operation, odors from the asphalt plant constituted an undue adverse impact. In finding that the smells are "adverse," the trial court found that "the project has caused perceptible asphalt odors on [neighbors'] properties and inside their homes if they leave the windows open or air conditioners running." Recognizing that chemical odors from petrochemical manufacture were not historically associated with the quarrying operations in the area, the trial court recognized that the odors were "adverse." Considering whether the adverse effects were "undue," the court found that some of the neighbors

_____

[5] I join Section I of the majority's opinion, and its affirmation of the trial court's findings and conclusions relating to the traffic impacts of the project under 10 V.S.A. § 6086(a)(5)(A).

"who are not hyper-sensitive credibly testified that they experience pungent, eye-watering, and throat-stinging odors from the project that permeate their properties in the summer time, and cause [them] to forego outdoor recreation." The trial court found that the smells were "shocking or offensive to the average person" and that therefore they amounted to undue adverse impacts.

¶ 43. Given that the project generated undue adverse impacts in the form of offensive odors, the trial court could not award an Act 250 permit unless NEMG offered reasonable conditions to mitigate the impact so that if the project continued to create adverse impacts, they would not be undue. The statute specifically provides that before a District Commission can grant a permit, it must find that the development "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). "Aesthetics" is a broad umbrella term, encompassing noise and smell in addition to visual impact. See In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 9, 199 Vt. 19, 121 A.3d 630 (identifying Criterion 8, or 10 V.S.A. § 6086(a)(8) as encompassing "aesthetics, noise, visual impacts, odors"). Approval of an Act 250 permit requires affirmative findings on all ten statutory criteria. In re Treetop Dev. Co. Act 250 Dev., 2016 VT 20, ¶ 11, __ Vt. __, 143 A.3d 1086. Given the undue adverse impact caused by the offensive odors from the project, NEMG was not entitled to an Act 250 permit unless it could establish reasonable conditions to mitigate the undue impact. See 10 V.S.A. § 6086(c) (authorizing imposition of conditions that are appropriate with respect to the permitting criteria listed in 10 V.S.A. § 6086(a)). "Permissible conditions include those with prospective application that are intended to alleviate adverse impacts that either are or would otherwise be caused or created by a project . . . ." In re Treetop, 2016 VT 20, ¶ 12. In short, once the trial court concluded that the odors generated by the asphalt plant created an undue adverse impact, it could only award NEMG an Act 250 permit if it included conditions that were reasonably likely to mitigate the impact so that it was no longer undue and adverse.

16

¶ 44. Based on the trial court's own findings, the condition it relied on to mitigate the otherwise undue adverse impact from the odors was not reasonably likely to serve the required purpose. That very condition had been in effect for two years and NEMG believed itself to be complying with that condition, yet the Project created the undue adverse impacts found by the trial court. The trial court's incorporation of the condition in NEMG's Air Permit into its Act 250 permit, and its recognition that violation could subject NEMG to enforcement action, did nothing to establish the reasonableness of the condition, or to counter the established inefficacy of the condition.

¶ 45. The trial court's, and majority's, analysis falls short for at least four reasons. First, it's circular, and essentially cuts the Act 250 proceeding out of the process. Referencing the condition prohibiting NEMG from emitting objectionable odors beyond the property line of the premises, the trial court explained, "[i]f complied with, [the condition] will adequately address [neighbors'] concerns over the odors" from the hot-mix plant, "because it forbids the impacts [neighbors] complain of." Essentially, the trial court concludes, and the majority agrees, that the plant's operation with the condition will not offend the sensibilities of the average person because the condition forbids such odoriferous impacts. Ante, ¶ 33. This reasoning assumes the reasonable efficacy of the condition—which is the contested issue in this case—and then concludes that since the condition is (presumed to be) effective it will be effective.

¶ 46. Under this approach the district commissions, or the Environmental Division, could dispense with the Act 250 process altogether. They could, without any hearing at all, simply award permits conditioned on compliance with the various Act 250 criteria, under the assumption that such conditions were sufficient to remedy any shortcomings in the applicant's proposal and with the reassurance that the Natural Resources Board's (NRB's) enforcement process was available to address any failure by the applicant to actually satisfy the criteria. That's not the system the Legislature set up. As we have recognized, before a permit can be approved, the District Commission (or Environmental Division) must make affirmative findings that the project satisfies

17

all of the Act 250 criteria. See, e.g., In re Treetop, 2016 VT 20, ¶ 11; In re SP Land Co., LLC Act 250 Land Use Permit Amendment, 2011 VT 104, ¶ 25, 190 Vt. 418, 35 A.3d 1007 (explaining that Act 250 "[r]ule 21 mandates that a permit may issue only when positive findings of fact and conclusions of law have been made under all criteria and subcriteria").

¶ 47. Second, the analysis is inconsistent with the trial court's own findings. The majority asserts that the trial court concluded that NEMG would comply with the condition imposed. Ante, ¶ 36. Actually, the trial court found "NEMG testified that it can and does comply with this condition." Even assuming that we treat this recitation of evidence as an actual finding of fact by the trial court,[6] it is unsupported by the evidence and squarely at odds with the trial court's own findings. If NEMG does, in fact, comply with the permit condition prohibiting emission of objectionable odors beyond its premises, then the trial court's finding that NEMG's operations have created an undue adverse impact in the form of "pungent, eye-watering, and throat-stinging odors" that "permeate [neighbors'] properties in the summer time, and cause them to forego outdoor recreation" cannot be right. The two findings are mutually inconsistent.

¶ 48. Third, in the face of the established undue adverse impact throughout the period when NEMG apparently believed itself to be complying with the permit limitations, the trial court's analysis offers no insight into what NEMG intends or is expected to do to change its practices. What NEMG has been doing—even though it believes that it has been complying with the permit condition not to emit objectionable odors—clearly is not working, as evidenced by the

---

[6] We have frequently recognized that a mere recitation of a party's testimony, often described as a "Krupp finding," "is not a finding of the facts contained in the testimony related and it cannot be so construed." In re M.G., 2010 VT 101, ¶ 14, 189 Vt. 72, 13 A.3d 1084 (quoting In re Hale Mountain Fish & Game Club, Inc., 2007 VT 102, ¶ 9, 182 Vt. 606, 939 A.2d 498 (mem.)); see also Krupp v. Krupp, 126 Vt. 511, 514, 236 A.2d 653, 655 (1967). We have repeatedly held that such "Krupp findings," which are not adopted by the court as fact, "cannot form the basis for a decision." In re M.G., 2010 VT 101, ¶ 14 (quoting In re E.C., 2010 VT 50, ¶ 14, 188 Vt. 546, 1 A.3d 1007 (mem.)). In this case, the only statement by the trial court that addresses whether NEMG has the ability to comply with its condition is this Krupp finding. Although I accept the majority's construction of the trial court's Krupp finding for the purpose of argument, the fact that the trial court made no actual findings on this subject, and its decision rests entirely on a Krupp finding, is yet another basis to reverse.

18

trial court's own findings. Given this clear record, NEMG must identify conditions that will reduce or eliminate the impact so that it is no longer unduly adverse. It made no such effort, devoting all of its effort to arguing that it does not create an undue adverse impact in the first place—a position rejected by the trial court. But neither NEMG nor the trial court offered any alternative of its own, instead relying on wishful thinking in the place of actual evidence.

¶ 49. Finally, and closely related, the purported condition isn't really a condition at all; it's a more detailed statement of the obligations NEMG has under 10 V.S.A. § 6086(c)(8). It describes the outcome to be avoided, but says nothing about the means to achieve that outcome. Conditions to mitigate undue adverse impacts typically include tangible requirements designed to promote the statutorily-required end, not merely restatements of the end itself.

¶ 50. The consequence of the trial court's approach is to reconfigure the relationship between environmental permitting and enforcement by shifting to the enforcement process questions that are supposed to be addressed in the first instance at the permitting stage. That would significantly impinge on the rights of interested parties, such as neighbors. Act 250 affords party status to adjoining property owners and others with a particularized interest in connection with permitting proceedings. 10 V.S.A. § 6085(c)(1)(E); see also In re Preseault, 130 Vt. 343, 348-49, 292 A.2d 832, 835-36 (recognizing Legislature's intent to include adjoining property owners in Act 250 proceedings at all levels). By contrast, although interested parties may participate in enforcement proceedings, "they are without the right to initiate such proceedings or raise additional violations." In re Treetop, 2016 VT 20, ¶ 13 n.4. Instead, it "falls to the NRB . . . to determine whether violations of Act 250, or permits issued thereunder, exist and to exercise the discretion" to initiate enforcement actions. Id. ¶ 13; see also 10 V.S.A. § 6027(g) (assigning the NRB discretion to initiate enforcement on matters related to land use permits). By shifting the question of whether and how NEMG can comply with its obligation not to emit objectionable odors to the enforcement stage, the trial court's approach deprives neighbors of their only certain opportunity to present evidence of the impact of the plant's operation on them, and to insist that

19

the asphalt plant not be permitted if it cannot be operated in a way that does not cause undue adverse impacts. That would undermine the Legislature's intent to afford a right of participation to adjoining landowners and others with a particularized interest through the permitting process.

¶ 51. As noted above, the primary focus of the hearing below as it related to the odors from the asphalt plant was the question whether neighbors sustained their burden to demonstrate an undue adverse impact. The trial court concluded that they had. I would hold that in the face of an established undue adverse impact, the burden shifts to the proponent of a permit to propose conditions to ameliorate the impact so that it is no longer unduly adverse, and to demonstrate the likely efficacy of those conditions. I would remand to the trial court for a hearing on this question.

¶ 52. For these reasons, I respectfully dissent.

¶ 53. I am authorized to state that Judge Carlson joins this concurrence and dissent.

_____

Associate Justice

20