NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 42

No. 21-AP-189

| | |
|---|---|
| In re Katzenbach A250 Permit #7R1374-1 (Christian Katzenbach & Clark Katzenbach, Appellants) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | February Term, 2022 |

Thomas G. Walsh, J.

David L. Grayck, Montpelier, for Appellants.

James W. Barlow of James W. Barlow PLC, Danville, for Interested Party Town of Albany.

Thomas J. Donovan, Jr., Attorney General, and Melanie Kehne, Assistant Attorney General, Montpelier, for Appellee Vermont Natural Resources Board.

Rebecca Beidler and Jeffrey Ellis, Albany, Appellees.


PRESENT: Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Johnson, J. (Ret.), Specially Assigned


¶ 1. **EATON, J.** Applicants Christian and Clark Katzenbach appeal the Environmental Division's decision granting but imposing certain conditions on an Act 250 permit for operating their sand- and gravel-extraction project. Applicants challenge the court's findings and conclusions under Criterion 5 and Criterion 8 of Act 250. We conclude that the trial court's findings under both criteria are not clearly erroneous, and that its conclusions under Criterion 8 are supported by its findings. However, we conclude that one condition imposed under Criterion 5 is unreasonable in light of the trial court's findings. We therefore strike that one Criterion 5 condition and affirm in all other respects.

¶ 2.     Applicants own a three-acre commercial sand and gravel pit located in Albany, Vermont. The surrounding area is primarily wooded with some open spaces and characterized by low-density residential and agricultural uses. Other gravel pits and similar operations exist in the area, including a pit about two miles away owned by the Town of Albany. Applicants' project involves extracting, loading, and transporting sand and gravel. Equipment used in the project includes a loader, screen, excavator, and two dump trucks.

¶ 3.     The project site is accessible from Vermont Route 14 by turning onto West Griggs Road, a Class IV hard-packed dirt road minimally maintained by the Town. The distance from Route 14's intersection with West Griggs Road to the project site entrance is about 1300 feet. Route 14 is a busy thoroughfare with steady traffic including heavy trucks. Existing traffic on West Griggs Road is minimal and consists mainly of residential traffic from a cluster of homes situated at the end of the road near the intersection with Route 14. One such home belongs to neighbors Rebecca Beidler and Jeffrey Ellis, who reside on property adjacent to the project.

¶ 4.     Applicants submitted an Act 250 permit application for their sand- and gravel-pit project on February 21, 2017. The District Commission issued applicants a permit on August 29, 2017, and the project has been in continuous operation since. The project has an operating life of twenty years with a maximum extraction rate of 30,000 cubic yards (CY) per year and a total maximum extraction of 121,000 CY. The 2017 permit approved a maximum project truck traffic of twenty round trips per day. It also restricted hours of operation to between 6:30 a.m. and 6:00 p.m. during the week and 7:00 a.m. and 1:00 p.m. on Saturdays with no operation on Sundays or national holidays.

¶ 5.     Neighbors appealed applicants' project permit to the Environmental Division in September 2017, alleging that the project was not in compliance with multiple Act 250 criteria. After a trial and site visit in December 2018, the Environmental Division held that applicants failed to meet their burden of proving that their project complied with Act 250. See 10 V.S.A. § 6088(a)

2

(requiring applicants to bear burden to establish compliance with Act 250 criteria). Applicants' permit was denied, though the court noted in its decision that applicants could apply for reconsideration within six months.

¶ 6. Instead, applicants reapplied for a permit in February 2019, supplementing their application with evidence of compliance with the relevant Act 250 criteria. After a hearing and site visit in May 2019, the District Commission issued applicants' current project permit on June 13, 2019. The 2017 permit conditions described above carried through to the 2019 permit. Neighbors again appealed to the Environmental Division. The Natural Resources Board also participated in the appeal pursuant to 10 V.S.A. § 8504(n)(3).

¶ 7. After trial in January 2021, the Environmental Division issued its decision on neighbors' appeal. Of note for the appeal to this Court, it concluded that additional permit conditions were required to ensure the project's compliance with Act 250's Criterion 5, which addresses traffic impacts, and Criterion 8, which addresses aesthetic impacts including noise. To mitigate traffic impacts on pedestrians under Criterion 5, the trial court prohibited haul trucks from travelling on West Griggs Road between 12:00 p.m. and 1:00 p.m. on any day to allow safe recreational opportunities during business hours. "As additional mitigation of project impacts" and to ensure compliance with Criterion 8, the trial court limited haul-truck hours to 10:00 a.m. to 12:00 p.m. and 1:00 p.m. to 3:00 p.m. on weekdays and 10:00 a.m. to 12:00 p.m. on Saturdays with no operation on Sundays and national holidays.

¶ 8. Applicants subsequently filed a motion to amend the Environmental Division's decision, seeking to extend the project's haul-truck operation hours beyond those ordered by the court. They argued that the court failed to consider a relevant case recently issued by this Court, In re JSCL, LLC CU Permit, 2021 VT 22, __ Vt. __, 253 A.3d 429, and that restricting haul-truck travel to four hours per day during the week and two hours on weekends was unreasonable. The

court denied the motion. It concluded that JSCL was not applicable and that even if it was, the condition imposed was reasonable under the standard set forth in that case.

¶ 9. Applicants now appeal the Environmental Division's decision adding permit conditions to bring the project into compliance with Act 250 and its subsequent denial of applicants' motion to amend, raising two issues. First, applicants challenge the Environmental Division's decision regarding Criterion 8, arguing that the trial court failed to make adequate findings to support its conclusion that the project's noise impact would be adverse and that it analyzed noise impacts using private-nuisance analysis as opposed to the appropriate analysis under Criterion 8. Second, they propose that the trial court's findings on the project's traffic impacts under Criterion 5 were internally inconsistent and otherwise fail to support its decision to limit haul-truck hours. Applicants ask this Court to reverse the trial court's decision, void the added restrictions limiting the project's haul-truck hours, and remand for further impact analysis consistent with Act 250.

¶ 10. To obtain an Act 250 permit, an applicant must satisfy ten criteria. 10 V.S.A. § 6086(a). The applicant bears the burden of establishing a prima facie case of compliance with Act 250 criteria, and opponents to the proposed project bear the burden of demonstrating undue adverse impacts under Criterion 5 through Criterion 8. Id. § 6088(b). To ensure these criteria are met, the issuing body may add requirements or conditions to a permit. Id. § 6086(c).

¶ 11. We review the Environmental Division's factual findings deferentially and its legal conclusions de novo. In re N.E. Materials Grp., LLC (NEMG I), 2015 VT 79, ¶ 18, 199 Vt. 577, 127 A.3d 926. We will not overturn the Environmental Division's factual findings "unless, taking them in the light most favorable to the prevailing party, they are clearly erroneous, meaning that there is no credible evidence to support them," id. (quotations omitted), or they are "internally inconsistent." In re N.E. Materials Grp., LLC (NEMG III), 2019 VT 55, ¶ 6, 210 Vt. 525, 217 A.3d 541 (quotation omitted). Although reviewed de novo, the Environmental Division's legal

4

conclusions will be upheld "if they are reasonably supported by the findings." In re Lathrop Ltd. P'ship I (Lathrop), 2015 VT 49, ¶ 21, 199 Vt. 19, 121 A.3d 630 (quotation omitted); see also In re Route 103 Quarry, 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694 ("[O]ur review of the Environmental Court's determination as to whether a proposed application would adversely affect surrounding lands is deferential."); In re N.E. Materials Grp., LLC (NEMG II), 2017 VT 43, ¶ 8, 205 Vt. 490, 174 A.3d 747 (noting we review Environmental Division's conclusion that certain conditions would mitigate adverse impacts deferentially).

¶ 12.    We first address applicants' concerns raised under Criterion 8, then turn to issues regarding Criterion 5.

## I. Criterion 8

¶ 13.    Criterion 8 requires that a proposed project "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historical sites, or rare and irreplaceable natural areas."   10 V.S.A. § 6086(a)(8).   Truck noise is a recognized aesthetic concern under Criterion 8.  NEMG III, 2019 VT 55, ¶ 8.

¶ 14.    Under this criterion, the Environmental Division made the following findings based on evidence presented by applicants.  To evaluate the noise impact of the haul trucks driving along Route 14 and West Griggs Road, applicants hired a sound engineer to perform sound modeling.[1] Results, measured in decibels (dBA), indicated that instantaneous noise levels from haul trucks driving on Route 14 measured 66 dBA LASmax[2] at neighbors' residence and 55-70 dBA LASmax

---

[1]  The engineer also evaluated the noise from the project site itself; however, those findings are irrelevant to the issues raised in the present appeal.

[2]  Applicants' sound engineer described sound events in terms of both Lmax and LASmax. As recognized in our Criterion 8 precedent, Lmax is "the maximum noise level that will occur irrespective of its duration" or "[s]imply put . . . instantaneous noise."  Lathrop, 2015 VT 49, ¶ 77. According to applicants' sound engineer, LASmax "represents the loudest, instantaneous sound level generated by a source."   In his testimony, the sound engineer explained that although he referred to Lmax and LASmax interchangeably in his report, his measurements were actually in LASmax throughout.  The difference between Lmax and LASmax is the time-weightings: Lmax is fast-weighted and LASmax is slow-weighted.  The trial court found, based on the sound

in areas of frequent human use on neighbors' property. Other residences would experience noise levels ranging from 60 dBA LASmax to 65 dBA LASmax from haul trucks passing on Route 14. Noise from trucks on West Griggs Road measured approximately 75 dBA LASmax at neighbors' residence and 55 dBA LASmax at most areas of frequent human use on neighbors' property.

¶ 15. In addition to instantaneous noise, applicants' sound engineer modeled dynamic noise over time.[3] Some heavy trucks similar to applicants' haul trucks already travel on Route 14 regularly. Each truck pass along West Griggs Road takes two-to-three minutes from Route 14 to the project site. Applicants provided their sound engineer with an estimated hourly truck capacity based on how quickly they believed they could load and dispatch a project truck. They projected a maximum of four round trips per hour but suggested five round trips would be possible "if they really pushed it." Under a "worst case scenario" of five round trips in an hour, the average noise levels produced would measure approximately 58 dBA Leq(1-hr) at neighbors' residence and 40-60 dBA Leq(1-hr) at areas of frequent human use.

¶ 16. To evaluate a project's aesthetic impacts, this Court uses the Quechee test, a two-pronged analysis stating that "a project violates Criterion 8 if: (1) the proposed project will have an adverse aesthetic impact and (2) that impact will be undue." Lathrop, 2015 VT 49, ¶ 74 (citing In re Quechee Lakes Corp., Nos. 3W0411-EB, 3W0439-EB, slip. op. at 19-20 (Vt. Envtl. Bd. Nov. 4, 1985), https://nrb.vermont.gov/sites/nrb/files/documents/3w0439-eb-fco.pdf [https://perma.cc/

___

engineer's testimony, that Lmax and LASmax are equivalent and interchangeable for purposes of evaluating maximum instantaneous noise levels in Act 250 cases. The Environmental Division designated its noise findings in Lmax. The parties do not challenge, and accordingly we do not consider, the propriety of using LASmax in place of Lmax to measure instantaneous noise in this appeal. See also In re JCSL, 2021 VT 22, ¶ 29 (concluding that trial court complied with Lathrop's requirement that it consider instantaneous noise where sound engineer measured using Leq(1-sec) instead of Lmax but evidence that Leq(1-sec) would achieve similar result to Lmax was uncontested). For consistency and clarity, this opinion refers to the sound engineer's instantaneous noise measurements solely in LASmax throughout.

[3] To measure dynamic noise, the sound engineer used Leq(n), which measures "the maximum noise level that will occur as averaged over a period of time." Lathrop, 2015 VT 49, ¶ 77.

2CN6-4FUB]). Only if a project poses an adverse impact will the reviewer—whether the District Commission or Environmental Division—have to assess whether the adverse impact is undue. NEMG III, 2019 VT 55, ¶ 10. If there is an undue adverse effect, the reviewer may impose reasonable conditions to ensure compliance with Criterion 8. 10 V.S.A. § 6086(c).

¶ 17. Under the first prong, to determine whether an aesthetic impact is adverse, the reviewer "considers whether the proposed project will be in harmony with its surroundings—in other words, will it fit the context within which it will be located?" NEMG III, 2019 VT 55, ¶ 10 (quotation and brackets omitted). This Court uses the "Barre Granite standard" as a "benchmark" to determine whether a noise impact is adverse. Id. ¶ 9 n.3. Generally, noise is adverse where it "exceeds 70 dBA (Lmax) at the property line and 55 dBA (Lmax) at surrounding residences and outside areas of frequent human use." Lathrop, 2015 VT 49, ¶ 80. However, this standard should not be applied rigidly because "the context and setting of a project should aid in dictating appropriate levels." Id. ¶ 81; see JSCL, 2021 VT 22, ¶ 19 (acknowledging flexible application of standard is proper to avoid absurd result such as 1 dBA difference between existing traffic and additional project traffic rendering project's noise adverse); In re Chaves, 2014 VT 5, ¶ 33, 195 Vt. 467, 93 A.3d 69 abrogated on other grounds by In re B&M Realty, LLC, 2016 VT 114, 203 Vt. 438, 158 A.3d 754 (same). Although reviewing bodies are required to consider a project's instantaneous noise, they may also assess other relevant corroborating data they find credible, such as the frequency or amount of additional noise events. NEMG III, 2019 VT 55, ¶¶ 17-18.

¶ 18. Here, the Environmental Division thoroughly applied the Quechee test to determine whether the project's noise effects would comply with Criterion 8. Starting with the first prong of the test, the court used the Barre Granite standard to guide its inquiry. See Lathrop, 2015 VT 49, ¶ 80 (explaining that we recognize Barre Granite standard to guide Act 250 permit determinations). In doing so, it considered the project's maximum instantaneous noise levels as required by Lathrop. See id. ¶ 88 (requiring Environmental Division to make Lmax instantaneous noise

7

findings when evaluating compliance with Criterion 8). It focused in particular on the impact at neighbors' residence, noting that the noise from Route 14 would create levels of 66 dBA LASmax and West Griggs Road traffic would create levels of 75 dBA LASmax. The court found significant that the noise events from West Griggs Road would exceed the Barre Granite surrounding-residence benchmark of 55 dBA Lmax by 20 dBA. However, it considered the context of existing truck traffic on Route 14 and concluded this fact tempered the potential noise impact from project trucks on Route 14. See id. ¶ 81 (stating that Barre Granite standard should not be applied rigidly because "the context and setting of a project should aid in dictating appropriate levels" of noise).

¶ 19. Moreover, the trial court found that consideration of Leq(n) measurements was useful to determine whether noise impacts would be adverse, which is in line with this Court's precedent permitting the Environmental Division to consider the frequency of noise events as well as individual instantaneous noise events. See NEMG III, 2019 VT 55, ¶ 16 (explaining court can consider "multiple types of data, including Lmax and Leq(n), when assessing Criterion 8 compliance"). It compared the preexisting traffic noise levels at neighbors' residence—50 dBA Leq(1-hr)—with the maximum possible project truck traffic noise levels—58 dBA Leq(1-hr). It then relied on this comparison between the existing context of the area and the additional impacts from the project, measured using both LASmax and Leq(1-hr), to conclude that twenty round trips per day from the project site would produce higher noise levels than existing traffic. See Lathrop, 2015 VT 49, ¶ 87 (explaining that thorough analysis of traffic noise should include consideration of frequency of high-decibel noise events). It therefore determined that the project's noise impact from haul trucks would be adverse.

¶ 20. The Environmental Division then moved on to discuss whether the adverse impact from the haul truck traffic noise would be undue. Under the second prong, an adverse aesthetic impact is undue if:

> (1) it violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) it

8

offends the sensibilities of the average person; or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

Id. ¶ 74 (alterations and quotations omitted).

¶ 21.    Because neither party presented a community standard that was implicated by the project's noise, the court addressed the second factor: whether the project's noise would "offend the sensibilities of the average person." Id.    Under this prong, the court again considered instantaneous noise, pointing out that traffic on West Griggs Road would result in forty 75 dBA LASmax events over the course of an eleven-and-a-half-hour workday.  Although it considered the LASmax events for Route 14 traffic as well, it concluded that, in the context of existing truck traffic on that road, the impact of the Route 14 LASmax events would not greatly increase the noise in the area.

¶ 22.    Having considered instantaneous noise events alone, the court again turned to the frequency of the noise events to evaluate the effects over time.  It compared the existing noise levels measured over time—50 dBA Leq(1-hr) at neighbors' residence and 35-55 dBA Leq(1-hr) at areas of frequent human use—with the maximum potential noise from the project—58 dBA Leq(1-hr) at neighbors' residence and 40-60 dBA Leq(1-hr) at areas of frequent human use—and the minimum potential noise from the project—56 dBA Leq(1-hr) at neighbors' residence and similar noise levels at areas of frequent human use.  Beyond the sound levels averaged over one hour, the court considered the increased frequency of 75 dBA LASmax events.  See NEMG III, 2019 VT 55, ¶ 18 (explaining that court must account for frequency of high-decibel noise events because that represents disruption experienced by people in area).  It reiterated that the project would create forty 75 dBA LASmax events within an eleven-and-a-half-hour workday from trucks travelling on West Griggs Road and emphasized that, in conjunction with the noise of project trucks travelling Route 14 to access West Griggs Road, the project would likely create over forty

noise events at 20 dBA LASmax above the <u>Barre Granite</u> benchmark. It determined that, unlike Route 14, West Griggs Road only had minimal residential traffic prior to the project.

¶ 23. As the last component of its analysis under the undue prong, the court considered neighbors' testimony about their experience of the haul-truck noise, which it found to be credible and persuasive. Neighbors testified that they could hear the haul trucks practically everywhere on their property and that the noise is loudest near roadways and at their residence. They also testified that the drastic increase in noise caused them to stop using parts of their property. The Environmental Division weighed this testimony as well as the sound engineer's testimony that he thought the project's noise impacts would not be significant. See <u>In re Wood NOV & Permit Applications</u>, 2013 VT 40, ¶ 38, 194 Vt. 190, 75 A.3d 568 (explaining that trial court, as trier of fact, resolves conflicting evidence). Drawing on all the factors above, including comparisons between existing noise and additional project noise using LASmax, Leq(1-hr), and human perception, the court came to its conclusion that the project's noise would be unduly adverse.

¶ 24. Despite the Environmental Division's thorough analysis of the findings to support its conclusions on both prongs of the <u>Quechee</u> test, applicants argue that the court made inadequate findings to support its conclusion. They argue that Act 250 requires the court to conduct a "public interest" analysis to determine whether an impact is unduly adverse[4] under the <u>Quechee</u> test, going so far as to suggest that the court must make specific "public interest findings" to comply with the statute. Operating on this premise, they assert that the trial court performed a "nuisance" analysis as opposed to a "public interest" analysis because it concluded that the project noise would be adverse to only neighbors and the trial court did not make these so-called "public interest" findings. This argument is unpersuasive.

---

[4] Applicants do not specify under which prong of the <u>Quechee</u> test their arguments fall. The briefing most often discusses the first prong—whether the noise impacts are adverse.

10

¶ 25. The trial court is not required to make special "public interest" findings under Act 250. Act 250 itself is the embodiment of the Legislature's evaluation of what is in the public interest. See In re Pilgrim P'ship, 153 Vt. 594, 596, 572 A.2d 909, 910 (1990) (explaining that one purpose of Act 250 is ensuring that " 'lands and environment are devoted to uses which are not detrimental to the public welfare and interests' " (quoting 1969, No. 250 (Adj. Sess.), § 1)). The requirement that a project satisfy all ten Act 250 criteria, including Criterion 8 on aesthetics, demonstrates that the Legislature has determined that preserving certain aesthetics is in the public interest. 10 V.S.A. § 6086. Despite various citations to constitutional limitations on the Legislature's ability to regulate private property use, applicants do not challenge the constitutionality of Act 250's permitting process or Criterion 8. Further, applicants' contention that financial interests are paramount to the public good is of no consequence to us in this case. The Legislature determined that preserving certain aesthetic standards, not maximizing a Town's potential financial benefits, is what is in the public interest when permitting projects. Id. § 6086(a)(8). Accordingly, the Environmental Division is not required to make "public interest" findings outside those required by Act 250.

¶ 26. Contrary to applicants' assertions, the fact that the Environmental Division considered neighbors' personal testimony about how they experienced the project's noise does not undermine its conclusions or transform the proceedings below into a private-nuisance action. Applicants' focus on the court's findings regarding neighbors' personal experiences ignores that the court relied on applicants' sound engineer's own noise-modeling report to evaluate both LASmax and Leq(1-hr) at not only neighbors' residence but also other residences in the area to come to its conclusion that the project noise would be adverse.

¶ 27. Under the undue prong, in determining whether an adverse impact would "offend[] the sensibilities of the average person," Lathrop, 2015 VT 49, ¶ 74, the trial court weighed the evidence before it, which included the sound engineer's conclusion that the noise would not be

11

substantial and neighbors' conflicting testimony that it was indeed substantial. See <u>Kanaan v. Kanaan</u>, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (explaining that it is trial court's duty to assess witness credibility and weigh evidence). An issuing body "need not poll the populace or require vociferous local opposition in order to conclude that an average person would consider the project to be offensive." <u>In re McShinsky</u>, 153 Vt. 586, 592, 572 A.2d 916, 920 (1990). Moreover, it is within the purview of a trial court to consider the "personal experience of noise" when evaluating whether traffic noise is undue. <u>NEMG III</u>, 2019 VT 55, ¶ 17. It was accordingly appropriate for the Environmental Division to take neighbors' testimony into account to discern how the project would impact the people who live around it, such as those who live in neighboring residences. See <u>id</u>. ¶ 18 (explaining that our concern is "ensuring that reviewers account[] for the disruption experienced by people in the area each time a truck pass[es] along a route"). To the extent that the Environmental Division occasionally used "nuisance" terminology when conducting its Act 250 analysis, we will not disturb its conclusion "over a choice of words when the substance is the same." <u>Ackerman v. Kogut</u>, 117 Vt. 40, 45-46, 84 A.2d 131, 135 (1951). As explained above, the Environmental Division made adequate findings to support its conclusions.

¶ 28. Applicants also argue that the trial court's application of the <u>Barre Granite</u> standard was excessively rigid. This argument has two parts. First, they propose that the trial court failed to apply the <u>Barre Granite</u> standard flexibly as required by this Court's precedent in <u>JSCL</u>. Second, they assert that the court applied <u>Barre Granite</u> in a manner divorced of "public interest considerations" because it did not consider the Town's financial and practical interests in the project and it only gave passing reference to residences in the area other than neighbors'.

¶ 29. First, the trial court did apply the <u>Barre Granite</u> standard flexibly. Applicants emphasize that existing truck travel on Route 14 would already cause 66 dBA LASmax noise events at neighbors' residence. They extrapolate that the court's conclusion that this amount of noise is adverse is excessively rigid because any project development that requires trucks could be

denied or would require limiting truck travel on the public road. This is hyperbolic and divorces a single fact from the context of the Environmental Division's entire decision. The Barre Granite standard must be applied flexibly to avoid absurd results and one key part to that flexible application is looking to the existing noise levels in a certain area. See Lathrop, 2015 VT 49, ¶¶ 80-87 (discussing flexibility of standard with emphasis on evaluating overall noise increase). The trial court did exactly that when it noted that the project's noise impacts would be tempered by the existing traffic on Route 14 but concluded that the noise would nonetheless be adverse. In doing so, it looked to the West Griggs Road truck noise and pointed out that traffic there would result in twenty round trips per day of 75 dBA noise events at neighbors' residence—events 20 dBA louder than the 55 dBA benchmark for residences. Even though existing Route 14 noise could cause 66 dBA noise events at neighbors' residence, the addition of West Griggs Road haul-truck noise and the increased frequency of truck noise supported the trial court's conclusion that overall the project would meaningfully increase the noise compared to existing levels. These changes in noise levels are fundamentally different from the 1 dBA change in JSCL or Chaves where we previously acknowledged the need for a flexible standard. See Chaves, 2014 VT 5, ¶ 33 (upholding conclusion that noise was not adverse where noise at residences increased minimally from 68 dBA Lmax to 69 dBA Lmax and was caused by only some activities); In re JSCL, 2021 VT 22, ¶¶ 20, 39 (concluding Barre Granite should be applied flexibly where any vehicle, not just project trucks, would cause 71 dBA Lmax at property line, 1 dBA Lmax over the Barre Granite standard, and project would be limited to nine round trips per day).

¶ 30. Second, applicants' assertion that a flexible application of the Barre Granite standard requires consideration of the financial and practical impacts of a project has no support in our precedent and runs contrary to the purpose of Act 250. Applicants cite no case law to support this argument beyond a 2017 case in which this Court declined to recognize the concept of aesthetic nuisance. See Myrick v. Peck Elec. Co., 2017 VT 4, 204 Vt. 128, 164 A.3d 658.

13

Using this case, applicants seem to propose that the Barre Granite standard, if applied without consideration of the Town's financial interests, would constitute judge-made law that encroaches on the "province of legislative decision-making." Id. ¶ 7. However, the decision to require projects within Act 250's jurisdiction to meet certain aesthetic-impact requirements before obtaining a permit is one that the Legislature itself made when it wrote Criterion 8. See 10 V.S.A. § 6086(a)(8) (requiring that a project "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historical sites, or rare and irreplaceable natural areas"). The purpose of Act 250 is to "protect and conserve the lands and environment of the state from the impacts of unplanned and uncontrolled changes in land use." NEMG I, 2015 VT 79, ¶ 25 (quotation omitted). It would therefore be contrary to the express language and purpose of Act 250 to require the Environmental Division to balance the aesthetic impacts of a project against a town's financial interests in a project. Accordingly, we conclude that applicants' challenges to the Environmental Division's application of Barre Granite are meritless.

¶ 31. The trial court conducted the appropriate legal analysis to determine whether the project's noise impacts would be unduly adverse under Criterion 8 of Act 250. In doing so, it made various findings that adequately support its overall conclusion that the project's impacts would be unduly adverse absent additional conditions to mitigate these concerns. See NEMG III, 2019 VT 55, ¶ 6 (stating that we will uphold Environmental Divisions conclusions "if they are reasonably supported by the findings" (quotation omitted)). Under our deferential standard of review, we will not disturb the trial court's determination that the project as permitted by the Commission did not comply with Criterion 8's undue-impact requirement. Lathrop, 2015 VT 49, ¶ 74 ("We defer to the environmental court's expertise in matters of land-use permitting and its conclusion on the impacts a proposed project will have on the environment.").

¶ 32. Since the Environmental Division's conclusion that the project's noise impacts would be unduly adverse is sound, we turn to whether the conditions it imposed to mitigate those

14

impacts were reasonable. "Once the Environmental Division has determined that a proposed project causes undue adverse impact under Criterion 8, the court must impose reasonable conditions to ensure the project complies with the criteria." NEMG II, 2017 VT 43, ¶ 36. The trial court identified that the frequency of loud noise events from trucks traveling to and from the project on West Griggs Road was the primary reason the project's noise would be unduly adverse. It emphasized that, based on the evidence in the record, these noise events would be most disruptive for residences in the area during the early mornings and late afternoons or evenings. It accordingly tailored its conditions to these findings by prohibiting trucking before 10:00 a.m. and after 3:00 p.m. on weekdays and before 10:00 a.m. and after 1:00 p.m. on Saturdays with no operation on Sundays or national holidays.[5] Further, it found that these new haul-truck hours would not jeopardize the project's extraction goals because applicants would still be able to achieve their daily hauling goals. Considering that the time restrictions imposed under Criterion 8 were tailored to what made the noise impacts unduly adverse and allowed the project to proceed while meeting its extraction goals, we conclude that the Environmental Division's conditions restricting morning and evening hours of operation were reasonable. See In re Champlain Parkway Act 250 Permit, 2015 VT 105, ¶ 12, 200 Vt. 158, 129 A.3d 670 (finding conditions imposed under Criterion 5 reasonable where they "were appropriately tailored to the evidence and findings"); see also 10 V.S.A. § 6086(c) (allowing appropriate permit conditions with respect to ten Act 250 criteria); In re Denio, 158 Vt. 230, 240, 608 A.2d 1166, 1172 (1992) (explaining that conditions imposed under § 6086(c) must be "reasonable") .

---

[5] The trial court stated that it was imposing a condition limiting traffic to between 10:00 a.m. and 12:00 p.m. and between 1:00 p.m. and 3:00 p.m. on weekdays and between 10:00 a.m. and 12:00 p.m. on weekends. When it stated this, it had already imposed a condition under Criterion 5 prohibiting truck traffic from 12:00 p.m. to 1:00 p.m. on any day. As we explain in the Criterion 5 analysis, that condition is stricken as unreasonable. We therefore analyze only the time constraints imposed under Criterion 8 written in the paragraph above. The trial court's Criterion 8 analysis is devoid of any mention of noise impacts being disruptive to the surrounding area at midday.

¶ 33.  We conclude that the Environmental Division's findings were sufficient to support its legal conclusion that the truck noise from applicants' project would be unduly adverse in violation of Criterion 8 of Act 250.  The Environmental Division also imposed reasonable conditions to mitigate these unduly adverse impacts.

## II.  Criterion 5

¶ 34.  Criterion 5 requires that a proposed project "[w]ill not cause unreasonable congestion or unsafe conditions" and will "provide safe access and connections to adjacent lands and facilities and to existing and planned pedestrian, bicycle, and transit networks and services." 10 V.S.A. § 6086(a)(5).  A permit may not be denied solely for lack of compliance with Criterion 5; however, reasonable conditions may be added to "alleviate" a project's traffic burden. Id. § 6087(b).

¶ 35.  The court made the following findings under this criterion.  The project site cannot accommodate more than two trucks at a time between loading and transportation.  West Griggs Road is around eighteen feet wide starting at its intersection with Route 14 and narrows to fourteen feet wide as it continues up toward the project site.  Project trucks measure about eight feet wide from tire to tire.  Due to its dimensions, the upper section of West Griggs Road is only wide enough for one truck at a time.  To accommodate this, there is a pull-off area about 200 feet from the pit entrance, allowing trucks to pass each other.  Trucks on West Griggs Road have occasionally backed down the road to reach the wider section near the bottom and allow trucks descending from the pit to pass.  Trucks have also backed into Route 14 from West Griggs Road.  To manage traffic and accommodate private clients, applicants schedule customer pick-ups at the project site and communicate with incoming and outgoing customer trucks through a CB radio channel.

¶ 36.  Neighbors have used West Griggs Road for recreation, including taking walks along the road with their dog.  West Griggs Road is lined on either side with embankments between

eight and ten feet tall. As pedestrians, neighbors feel unsafe sharing the road with project trucks on the narrower portions of the road.

¶ 37. Applicants first argue that the Environmental Division's findings under Criterion 5 are internally inconsistent, so we begin there. "Our review of the Environmental Division's findings of fact is deferential." NEMG I, 2015 VT 79, ¶ 18. It is up to the Environmental Division to "determine[] the credibility of witnesses and weigh[] the persuasive effect of evidence." In re Eastview at Middlebury, 2009 VT 98, ¶ 10, 187 Vt. 208, 992 A.2d 1014. We will not disturb those findings unless they are "clearly erroneous," meaning "there is no credible evidence to support them or . . . they are internally inconsistent." NEMG III, 2019 VT 55, ¶ 6 (quotations omitted).

¶ 38. Applicants specifically challenge the trial court's finding that the haul trucks travelling on West Griggs Road created unsafe conditions for pedestrians. They propose that this finding is inconsistent with evidence in the record showing that the road is eighteen feet wide and narrows to fourteen feet wide and that haul trucks are approximately eight feet wide. Accordingly, they assert that it is clearly erroneous for the court to conclude that a pedestrian would feel unsafe with a six-foot buffer between them and the trucks at the narrowest points of the road.

¶ 39. That applicants would draw a different conclusion regarding pedestrian safety from the evidence in the record does not render the Environmental Division's findings clearly erroneous. The court reviewed video recordings of trucks travelling on West Griggs Road, considered neighbors' testimony of their perception as pedestrians, and took into account the fact that the road was buttressed by tall embankments. Taking these together, it concluded that it would be difficult for a pedestrian to safely get out of the way of a truck. It is true that the court also heard testimony from applicants' traffic expert saying that he thought the trucks would not pose a safety threat to the public and that it generally found the expert to be credible. However, it is within the trial court's discretion to weigh the persuasive effect of the evidence. Eastview at Middlebury, 2009 VT 98, ¶ 10. The court's findings are not rendered clearly erroneous just because some

17

inconsistent evidence exists in the record. See In re Shaw, 2008 VT 29, ¶ 7, 183 Vt. 587, 945 A.2d 919 (mem.) ("Findings of fact will not be disturbed, even in the presence of substantial modifying evidence, if there is credible evidence supporting them."). We therefore conclude that the trial court's Criterion 5 findings are not clearly erroneous.

¶ 40. Relying on the trial court's findings, we must now determine whether the condition prohibiting project haul truck traffic between 12:00 p.m. and 1:00 p.m. is reasonable. The Environmental Division may impose "reasonable" conditions on an Act 250 Permit. Denio, 158 Vt. at 240, 608 A.2d at 1172 (quotation omitted). Determining whether conditions are "reasonable" is case-specific and requires an evaluation of the findings. See In re Hinesburg Hannaford Act 250 Permit, 2017 VT 106, ¶ 56, 206 Vt. 118, 179 A.3d 727 (explaining that "courts must decide on a case-by-case basis whether to impose mitigating conditions and which conditions to impose" to address unreasonable congestion or unsafe traffic conditions caused by proposed project). A condition addressing traffic concerns is reasonable when the condition is "appropriately tailored to the evidence and findings." In re Champlain Parkway Act 250 Permit, 2015 VT 105, ¶ 12, 200 Vt. 158, 129 A.3d 670; see also In re Costco Stormwater Discharge Permit, 2016 VT 86, ¶ 17, 202 Vt. 564, 151 A.3d 320 (stating that determination of reasonableness in one case does not automatically support determination of reasonableness in another case). In other words, a condition is unreasonable if it fails to address the supposed harm or concern creating an undue adverse impact in light of the trial court's evidentiary findings and legal conclusions specific to the proposed project.

¶ 41. The trial court found that neighbors have historically used West Griggs Road to walk their dog, and that as a result of the truck traffic, neighbors have stopped taking their regular walks because they feel unsafe as pedestrians. The trial court identified three areas of concern for traffic safety: (1) trucks backing down West Griggs Road; (2) trucks backing out from West Griggs Road into Route 14; and (3) difficulty for pedestrians to get out of the path of oncoming trucks

18

due to the width of West Griggs Road and the embankments on either side of the road. To address the first two concerns, it required applicants to schedule arrivals and communicate via a radio to minimize trucks needing to back town West Griggs Road and prohibited trucks from backing into Route 14 from West Griggs Road. To address the third concern, it stated: "To allow for safe recreation opportunities during business hours, haul trucks shall not travel West Griggs Road between 12:00 p.m. and 1:00 p.m. on any day." In a footnote, it explained that it imposed further restrictions on operation hours under Criterion 8 that would also reduce potential conflicts with pedestrians.

¶ 42. The first two traffic conditions are tailored specifically to the findings. Minimizing the occurrence of trucks backing down West Griggs Road and prohibiting backing into Route 14 prevent the safety concerns surrounding large trucks backing up. In contrast, there is a more tangential connection between the haul-truck safety issue for pedestrians on West Griggs Road and the condition prohibiting haul trucks from travelling between 12:00 p.m. and 1:00 p.m. The trial court made no findings regarding when pedestrians walk along West Griggs Road, let alone any findings that they would specifically need a safe time to walk around midday.[6] In fact, the record is absent of any evidence of a historic practice of walking dogs along West Griggs Road around that time and neighbors never testified to having such a need.[7] Although the trial court explained that this would give pedestrians a time to walk during business hours, it made no findings regarding the need to recreate on West Griggs Road during business hours.

---

[6] During a hearing, the trial court suggested a lunch-hour break, and in a written response, applicants indicated they would be willing to accept a 12:30 p.m. to 1:00 p.m. break in haul truck travel in the context of negotiating hours. These negotiations do not alter our conclusion that the trial court made no findings supporting the need for a lunch-hour break.

[7] We note that when the trial court asked for submissions on what permit conditions would be reasonable, neighbors, as representatives of the community, requested operating hours of 8:00 a.m. to 4:00 p.m. four days per week, with no lunch-hour hiatus. This reinforces our conclusion that the record is absent of any evidence of a need for a lunch-hour break that would support the trial court's condition prohibiting haul-truck operation from 12:00 p.m. to 1:00 p.m. any day.

¶ 43. Further, the court noted that the project's haul-truck hours were also limited to between 10:00 a.m. and 3:00 p.m. under Criterion 8. It is unclear why pedestrians would need that additional midday hour to walk during the day when they could recreate on the road without fear of trucks during business hours before 10:00 a.m. or after 3:00 p.m., to say nothing of non-business hours. The trial court does not explain how five hours of operation per day leaves insufficient opportunity to provide "safe access" for existing pedestrian routes. 10 V.S.A. § 6086(a)(5). Because this condition is not tailored to address the trial court's findings regarding the harm posed to pedestrians, the condition is unreasonable and stricken from the permit.

III. Conclusion

¶ 44. In summary, the trial court's findings are not clearly erroneous. It also committed no error when it concluded that the project created unduly adverse impacts under Criterion 8 that required the imposition of reasonable conditions to mitigate those impacts. The trial court properly concluded that the project created unsafe traffic conditions for pedestrians under Criterion 5; however, its condition prohibiting haul truck traffic from 12:00 p.m. to 1:00 p.m. on all days was not tailored to address the concerns raised in its findings and is therefore unreasonable. We accordingly strike that condition but affirm the Environmental Division's decision in all other respects.

The condition prohibiting haul-truck travel on West Griggs Road between 12:00 p.m. and 1:00 p.m. on any day is stricken; affirmed in all other respects.

FOR THE COURT:

_____
Associate Justice

¶ 45. **JOHNSON, J. (Ret.), dissenting.** I concur with all aspects of the majority's opinion except for its conclusion that the condition prohibiting haul trucks from traveling on West Griggs Road between 12:00 p.m. and 1:00 p.m. is unreasonable. In my view, the condition is

amply supported by the Environmental Division's findings and the record evidence and was therefore within the court's discretion to impose. I therefore respectfully dissent.

¶ 46. The Environmental Division has discretion under Act 250 to impose "reasonable conditions . . . to alleviate the burdens created" by a development that creates congestion or unsafe traffic. Id. § 6087(b); see also id. § 6086(c) ("A permit may contain such requirements and conditions as are allowable in the proper exercise of the police power and that are appropriate with respect to subdivisions (a)(1) through (10) of this section . . . ."). Such conditions may include establishing hours of operation for the proposed project. See In re Treetop Dev. Co. Act 250 Dev., 2016 VT 20, ¶ 12, 201 Vt. 532, 143 A.3d 1086 (stating that "[p]ermissible conditions include those with prospective application that are intended to alleviate adverse impacts that either are or would otherwise be caused or created by a project," such as "establishing hours of operation"). We have stated that a condition is reasonable if the Environmental Division's findings support its conclusion that the condition, if complied with, will mitigate the identified potential harm. In re N.E. Materials Grp., LLC, 2017 VT 43, ¶ 23, 205 Vt. 490, 174 A.3d 747. We review this question "deferentially." Id. ¶ 8.

¶ 47. The findings in this case support the court's decision to restrict truck traffic during the lunch hour. The trial court found that haul trucks take up most of the width of the road, which has high banks, making it difficult for pedestrians to move safely out of the way. It found that neighbors had traditionally used the road to walk their dog and enjoy a stroll but felt unsafe doing so when the trucks were operating. As a result, they no longer took regular walks on the road. These findings are supported by the evidence, including testimony from neighbor Jeffrey Ellis that "we don't feel comfortable using [the road] during operational hours because of that particular safety issue of being able not to get out of the way, basically, from a vehicle." To ameliorate these impacts, the court concluded that truck traffic should pause from noon to 1 p.m. to allow for recreational use during the day. Pausing operations for a brief period in the middle of the day is a

rational way to alleviate the impacts of the project on neighbors' ability to use the road for recreation during business hours. In other words, the condition, if followed, will mitigate the harm. See id. ¶ 23 (affirming condition precluding trucks from crossing center line at specific curve because evidence supported court's factual findings and "the condition, if complied with, will prevent the potential harm").

¶ 48. In concluding that the condition is insufficiently tailored to the findings, the majority requires specific evidence that pedestrians walked dogs on the road during the noon hour. This is an unreasonably narrow view of the evidence and disregards the broader context of the trial court's effort to mitigate adverse impacts. The trial court heard extensive evidence on noise, use of the road and safety issues for pedestrians. It addressed these issues under both criteria 5 and 8, in the sense that mitigation under one factor also provided mitigation under another factor. Limiting truck trips both mitigated noise and favored recreation, and allowing a hiatus between 12 p.m. and 1 p.m. both mitigated noise and allowed recreation. The trial court's decision and findings should be read as a whole package. The opinion, instead, parses each one separately without seeing the overlapping effect of the conditions.

¶ 49. By taking such a narrow view of what the findings and evidence support, the majority is effectively replacing the Environmental Division's discretionary judgment with its own. Whenever the trial court is required to exercise discretion, our longstanding rule is that we will not substitute our judgment for that of the trial court. See, e.g., In re LaBerge NOV, 2016 VT 99, ¶ 35, 203 Vt. 98, 152 A.3d 1165 (explaining that Environmental Division "enjoys broad discretion in assessing the credibility and weight of a witness's testimony, and we will not second-guess these determinations on appeal" (quotation omitted)); Agency of Nat. Res. V. Supeno, 2018 VT 30, ¶ 24, 207 Vt. 108, 185 A.3d 1264 (stating that Environmental Division's imposition of civil penalties "represents a discretionary ruling that will not be reversed if there is any reasonable basis for the ruling" (quotation omitted)); In re Entergy Nuclear Vt. Yankee Discharge Permit 3-

1199, 2009 VT 124, ¶ 36 n.9, 187 Vt. 142, 989 A.2d 563 (noting that we apply deferential standard of review to environmental court's evidentiary rulings and will reverse only for abuse of discretion that results in prejudice).

¶ 50. The Environmental Division's discretionary authority to impose permit conditions has to be viewed in the same light, and the conditions it imposes should be given deference on appeal unless they are clearly unreasonable, meaning that there are no findings or evidence to support them. See In re N.E. Materials Grp., LLC, 2017 VT 43, ¶ 8 (explaining that whether court's findings support imposition of Act 250 permit condition "is a question we review deferentially"); cf. In re Entergy Nuclear Vt. Yankee Discharge Permit 3-1199, 2009 VT 124, ¶¶ 54-55 (holding that Environmental Division is granted broad discretion to impose permit conditions when reviewing agency decisions, and conditions will be upheld if supported by record); In re Lorentz, 2003 VT 40, ¶ 7, 175 Vt. 522, 824 A.2d 598 (mem.) (affirming zoning permit conditions imposed by environmental court that were not clearly erroneous); see also In re Snowstone, LLC Act 250 Jurisdictional Op., 2021 VT 72A, ¶ 14, __ Vt. __, 274 A.3d 42 (explaining that findings are clearly erroneous if "there is no credible evidence to support them" (quotation omitted)). Otherwise, the conditions are effectively subject to de novo review in the appellate court, which is objectionable for all the same reasons that the appellate court does not substitute its judgment for the trial court on other discretionary calls. As a general principle, the trial court, as the trier of fact, is in the best position to assess the credibility of witnesses, weigh competing evidence, and make findings. State v. Huston, 2020 VT 46, ¶ 10, 212 Vt. 363, 236 A.3d 1291; Mullin v. Phelps, 162 Vt. 250, 261, 647 A.2d 714, 720 (1994). Furthermore, the Environmental Division is a specialized court with expertise to fashion remedies and balance interests among competing parties in land-use cases. See In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 75, 199 Vt. 19, 121 A.3d 630 ("We defer to the environmental court's expertise in matters of land-use permitting and its conclusions on the impacts a proposed project will have on the

23

environment."); Sec'y, Vt. Agency of Nat. Res. V. Handy Fam. Enters., 163 Vt. 476, 482, 660 A.2d 309, 313 (1995) (stating that appellate court must accord deference to decisions within specialized knowledge of environmental court). By deleting one of the conditions at the appellate level, we undermine the Environmental Division's authority to fashion what it saw as a complete remedy. That is not a proper appellate function, so we ought to lean toward upholding the Environmental Division when its decision is supported by the findings and evidence.

¶ 51. Here, there is ample evidence that neighbors could not safely use the road at the same time as applicant's trucks, a finding that the majority properly upholds. Although different judges might disagree about the specific hours of operation that should be imposed to mitigate these impacts, it is difficult to conclude that the Environmental Division's decision was clearly unreasonable. Cf. Knutsen v. Cegalis, 2011 VT 128, ¶ 13, 191 Vt. 546, 35 A.3d 1059 ("That a different weight or conclusion could be drawn from the same evidence may be grist for disagreement, but does not show an abuse of discretion."). To the contrary, the decision fell well within the court's broad discretion to determine appropriate conditions and therefore should be upheld.

¶ 52. Interestingly, applicants essentially conceded the reasonableness of the condition. At the close of trial, applicants' counsel suggested that applicants would be willing to accept reduced hours of operation to mitigate noise and safety impacts. The court asked whether applicants had considered "a lunch hour time frame when trucks wouldn't come in or out on the road?" Counsel asserted that this would make it difficult for private individuals to get a load during the lunch hour, and the discussion moved to other topics. The court gave the parties an opportunity to submit proposed conditions in writing after the evidence closed. Neighbors proposed that the court limit operating hours to 8 a.m. to 4 p.m. on Monday, Wednesday, Thursday, and Friday, which applicants opposed. Applicants stated, however, that they had "considered the Court's request for a weekday lunch period during which there would be no operations . . . [and that they

were] prepared to accept a condition which prohibits all weekday operations between 12:30pm-1pm." (Emphasis added.). After the court issued its final order, applicants filed a motion to alter or amend in which they asked the court to amend the condition "so that the hauling of sand and gravel (earth extraction material) on West Griggs Road is allowed from 8:00 a.m. to Noon, and from 1:00 p.m. to 4:00 p.m., Monday-Friday; and 9:00 a.m.-Noon, on Saturday." To be fair, applicants offered various scenarios for hours of operation in an effort to obtain as many hours as possible, and their willingness to include a noon-hour cessation of business was related to that goal. I'm not suggesting applicants waived their right to challenge the condition on appeal, but at the very least, the discussion shows that a noon-hour hiatus did not come out of left field. It was a condition that applicants themselves proposed and that they stated on the record they were prepared to accept. Under these circumstances, and in light of its well-supported findings on pedestrian safety on the road, I find it hard to fault the trial court for imposing such a condition.

¶ 53. Because the trial court's decision was not clearly unreasonable, I respectfully dissent.

¶ 54. I am authorized to state that Chief Justice Reiber joins this dissent.

_____
Associate Justice (Ret.), Specially Assigned

25